An order will be entered denying the application.

---

New York County.—Hon. RASTUS S. RANSOM, Surrogate.—December, 1890.

## MATTER OF BACH.

*In the matter of the judicial settlement of the account of* Nevin W. Butler *and* Alexander Kirkland, Jr., *executors of the will of* John C. Bach, *deceased.*

Testator at the time of his death was a member of a partnership composed of testator and one N.   The partnership articles provided that in case of the death of testator and the continuation of the business, the executors of testator should pay to N. such annual amount as should be agreed in lieu of the services of testator.   The will of testator provided that the executors might employ so much of testator's capital in the business as in their opinion might be advantageously so employed, and upon such terms as to profits and losses as they might deem just and proper.   For several years testator had taken no active part in the business.   *Held,* that under the will the executors had power to enter into a partnership with the surviving partner, and that an agreement by them to allow the surviving partner $2,500 a year, chargeable against the estate, in lieu of the services of testator, was authorized.

One of the executors, B., had been in actual charge of the business for some time before the death of testator and it appears that his services were very necessary to the business. After testator's death B. continued to perform in the new firm, composed of the executors and the surviving partner, the same duties as he had performed in the old firm. The surviving partner, N., who never interfered in any way with the business, paid the executor B. a salary for conducting the business. *Held,* that such an agreement was not improper.

For the purpose of settling the estate and realizing on the assets, the plant and good-will of the business were sold at auction by the executors and the surviving partner. At this sale the surviving partner became the purchaser of such plant and good-will for a sum only about one ninth what the good-will alone was worth. One item of plant alone was worth twice the whole price paid upon the sale. Afterwards the surviving partner sold to one of the executors, a half interest in such plant and good-will, for half the amount so paid by him, and then they formed a new partnership for conducting the same kind of business. *Held,* that this transaction was within the prohibition of the law of even an indirect purchase by an executor of the assets of the estate.

Where the assets of the estate have been purchased by an executor in violation of law, and by reason of the circumstances it is inexpedient or very difficult to obtain a fair value of such assets upon a resale, the Surrogate will not set aside the sale, but will surcharge the executor's account with the difference between the amount realized on the sale and the value of the property sold as shown by the executors' inventory.

Two pictures belonging to the estate were sold at auction very much below their value, to a daughter of one of the executors, through instructions conveyed from the daughter to the auctioneer through that executor. Each executor purchased from this daughter one of the pictures at a sum immensely below their inventoried value. *Held,* that a resale of the pictures should be ordered.

After the formation of the firm composed of the surviving partner of the former firm and one of the executors, the executors issued a circular to the persons interested in the estate, alleging that they had an offer from the new firm of a certain price for the outstanding accounts, and further stating that they had no interest but that of the heirs, concealing the fact that one of the executors signing the circular was one of the members of the firm which wished to purchase the outstandings. The sale of a portion of the outstandings was made by the consents obtained from the heirs by this circular, in ignorance of the fact that the executor was an interested party to the transaction. *Held,* that the sale should be set aside, that the executors should account to the estate for the amounts received from such portion of the outstandings as have been realized on, that there should be a sale of the interest of the estate in the ac-

counts unsold, that if, upon resale, they did not produce a larger sum than that realized by the executors, then the former purchase was to stand.

ACCOUNTING of the executors of the will of John Bach, deceased.

R. B. McMASTER, *for the executors.*

PURDY VAN VLIET, *for the contestant.*

SAMUEL S. THOMAS, *special guardian.*

THE SURROGATE.—The testator died in January, 1885. For nearly thirty-five years prior thereto he had been engaged in the business of selling proprietary medicines, chiefly Townsend's Sarsaparilla. During the greater part of this time the executor Butler had been manager and confidential clerk. At the time of the testator's death the firm was composed of the deceased and E. B. Nostrand. Subsequent to the death of the testator and up to January, 1888, the business was continued under the firm name of Bach & Nostrand, the parties thereto being the qualifying executors of the testator and the surviving partner. The executors and the surviving partner entered into a written agreement for the continuation of the business, which provided for sharing equally in the profits, but the new firm to pay to the surviving partner, as indemnity for the loss of the services of the testator, the sum of $2,500 a year. While the business was being conducted under this agreement, Butler remained as manager for Mr. Nostrand, drawing a salary paid by the latter until the liquidation, in September, 1888, originally at the rate of $4,000 a year, but

which was subsequently reduced because of the diminution in the business of the firm. It appears that while the business was being thus conducted by the executors and the surviving partner, the latter was paid $7,625, under the terms of this agreement, which was in addition to his profits under the articles of copartnership. This sum was fixed on the basis of the salary paid to Butler prior to the death of Mr. Bach, which was $3,000 a year, for the reason, as stated by Butler, that as executor he could not take any salary from the business, and afterwards Nostrand agreed with him (Butler) to conduct the business, and pay him. There was practically no difference in the character of the duties performed by Butler before and after the death of the testator. Nostrand never interfered in any way with the business. For several years prior to his death, the testator was never at the office, and it would seem as if Butler were an indispensable adjunct to the proper conduct and continuation of the business.

Objection is made to the salary paid to Nostrand for the management of the business. The fundamental test to be applied to the actions of an executor in the administration of his trust is whether he has acted in good faith and conscientiously striven to carry out the intentions of his testator. The will provides that the executors may " continue so much of the capital employed by me in the business of the firm of Bach & Nostrand as in their opinion may be thus advantageously employed, and on such terms as to sharing in the profits and losses as they shall deem just and proper and for such length of time as will be

consistent with the due execution of the powers and trusts herein contained." There is no doubt in my mind but that this language authorized the executors to enter into an agreement with the surviving partner for the continuation of the business. The articles of copartnership under which the testator did business were excluded by the referee. This ruling was clearly improper. Inasmuch, however, as the documents have been marked for identification and are included among the exhibits returned to the court, I will consider the exception taken to the ruling of the referee in this regard as sustained, and in arriving at a conclusion I have considered the documents as in evidence. They provide expressly that the executors, in case of his death and the continuation of the business, " shall pay to Nostrand such annual amount as shall or may be agreed upon in lieu of the services of said Bach." The agreement entered into by the executors with the surviving partner, in pursuance of the authority vested in them by the will, and the articles of agreement between the members of the old firm, provides that the executors " should allow and pay over to the party of the second part (Nostrand) for the loss of the services of the late John C. Bach, a sum at and after the rate of $2,500 per annum, . . . . . and that the said party of the second part may charge the same to the said executors and trustees as a portion of their share of said profits." I can see nothing improper in the arrangement entered into between the executor Butler and Nostrand, having in view the retention of Butler in the business. I think that his retention in the business must have been contemplated by decedent.

There is no question made but that the executors in good faith continued the business for the best interests of the life tenant and remaindermen, nor is any evidence given tending to show that in fixing the salary of Nostrand at the sum named they were guilty of any neglect or bad faith. The most that can be asserted in this connection is that they were guilty of an error of judgment, and for this they are not liable.

It is claimed by the objectors that in case this arrangement is approved by the Surrogate, the amount deducted is excessive; the sum charged against the trustees of the estate should be only one half of the salary of Nostrand, and the Matter of Laney (50 *Hun,* 15) is cited, in support of this contention. In the case cited the deceased, his administrator and one Barker were partners under articles which fixed the term at seven years and provided that in case of the death of any of the parties before the expiration of the said term, the partnership might be continued by the survivors until the expiration of the term limited, "and the share of the profits on that part of the capital stock belonging to such deceased partner, less the sum of $2,000, the agreed value of his services per year, shall be paid as often as once in each year to his personal representatives." The administrator treated the $2,000 to be thus deducted as belonging to the surviving partners to be divided between them, but the court held that the estate was entitled to its share of the sum so deducted. This construction was adopted by the court because the copartnership agreement did not declare what should be done with this money that was to be deducted from the share of the

profits belonging to the estate; in the case at bar there is no necessity for resorting to construction to supply a direction which has already been provided by the parties to the agreement. The contracts between the testator and his representatives with the surviving partner expressly state that the sum so withdrawn shall be paid to Nostrand and charged against the share of the profits of the estate. The conclusion of the referee in this respect is therefore sound.

I do not think the surviving partner was entitled to salary during the period, viz.: January 15th to September 1st, 1888, and with this exception the referee is sustained.

The widow of the testator, the life tenant under the will, died in August, 1887, and the executors deeming that the time had come for the conversion of the estate into cash, to divide it into shares and carry out the provisions of the will with respect thereto, proceeded to realize upon the assets of the estate. On March 15, 1888, they sold at auction, at the Exchange Salesrooms in New York city, the good-will of the business, including the plant of the factory and the proprietary rights. The plant which was sold included vats and tubs, bottles, tools and instruments. Prior to the sale the same was extensively advertised in newspapers published in the city of New York, and printed handbills were mailed to each of the legatees. The property was struck down for $300 to a Mr. Scofield, who attended the sale as the representative of Mr. Nostrand. The good-will of the business alone was inventoried at $2,750, and it is in evidence that Nostrand offered that sum therefor. Mr. Butler testified on cross-examination

that the bottles alone, which were included in the sale, were worth $600.   Shortly after the sale of the good-will, and in conformity with arrangements which had been theretofore made between them, the executor Butler and Nostrand formed a partnership under the style of Nostrand & Company, and Nostrand conveyed to Butler for $150, a one-half interest in the property purchased for him at the sale by Schofield.   From all the evidence in the case I am forced to the conclusion that the transactions in question constitute a purchase by Butler indirectly of the good-will and property and that it comes within the prohibition of the law.

It is an ancient and very familiar doctrine that the sale by an executor or administrator of the property of the estate to himself, either directly or indirectly, whether at private sale or at public auction, no matter how honest, open and fair, may be avoided at the option of the beneficial owner or *cestui que trust* (Davoue v. Fanning, 2 *Johnson's Ch.* 252 ; Michoud v. Giroud, 4 *How. U. S.* 503 ; Met. El. R. R. Co. v. Manhattan R'way Co., 14 *Abb. N. C.* 253, and note showing numerous cases wherein the doctrine declared in Davoue v. Fanning has been approved ; Boerum v. Schenck, 41 *N. Y.* 182).   The principal point in Davoue v. Fanning was whether the plaintiff was not entitled to set aside a sale of certain real estate made by the executor, at public auction, because, by a previous arrangement, he had suffered the property to be bought in for his wife, and executed a deed in pursuance of the sale in trust for her.   It was claimed by the defendants that the sale was unobjectionable, having been made at public auction, in good faith, and for a fair price, and

the purchase was not made for his own benefit, but for his wife who was one of the *cestui que trusts,* having an interest in the land.   Chancellor Kent said the case fell clearly within the spirit of the principle " that if a trustee acting for others ·sells an estate and becomes himself interested in the purchase, the *cestui que trust* is entitled to come here as of course and set aside that purchase and have the property re-exposed for sale."   At page 259 he says : " However innocent the purchase may be in the given case, it is *poisonous* in its consequences.   The *cestui que trust* is not bound to prove, nor is the court bound to judge, that the trustee has made a bargain advantageous to himself. The fact may be so, and yet the party not have it in his power, distinctly and clearly, to show it.   There may be fraud, as Lord Hardwicke observed, and the party not able to prove it.   It is to guard against this uncertainty and *hazard* of abuse, and to remove the trustee from temptation, that the rule does and will permit the *cestui que trust* to come, at his own option, and without showing actual injury, and insist upon having the experiment of another sale.   This is a remedy which goes deep, and touches the very root of the evil.   It is one which appears to me, from the cases which have been already cited, and from those which are to follow, to be most conclusively established."   The rule seems to have been established in this case that the *cestui que trust* may elect to set aside the sale and that it would be proper for the court to order a resale at the price bid by the trustee, and if it does not sell for more, then the purchase is to stand.   The right of the *cestui que trust* to this election is recog-

nized in Barker v. Smith (1 *Dem.* 290), where it was held that " if the property is still in the possession of the executor, it is within the power of the court to require him to restore it to the estate. He ought not to have bought it and ought not to be allowed to retain it against objection, even if it were admitted that he purchased in good faith and paid an adequate consideration, but the parties entitled to object to such purchase are at liberty to sanction it. . . . ." In Jackson v. Walsh (14 *Johns.* 411) it was stated that the rule is to order a re-sale, and if the property sells for more, the *cestui que trust* takes the surplus, otherwise, the original sale stands.

It would be unsafe and improper to direct a re-sale of the good-will and plant in the present case, for reasons that must be obvious upon reflection. In the first place, some portion of the property must have been disposed of since the auction sale. Second, the rights of Nostrand could not be affected by a decree of this court, and in a proceeding to which he was not a party. Third, even in case the good-will were put up at auction, it is extremely improbable that an adequate price would be realized therefor, in view of the litigation liable to ensue because of the conflicting rights of Nostrand and the purchaser at such a sale. It seems, therefore, to be a case for the application of the rule laid down in Schenck v. Dart, 22 *N. Y.* 420. In that case, the executors sold certain shares of stock at the Merchant's Exchange, the par value of which was $1,000. The stock was inventoried at 80 per cent, and sold at 56 per cent of the par value. The court found that Norman Dart, a brother of one of the ex-

ecutors, was the nominal purchaser, but that the real purchaser was Russell Dart, and that this being so, " the law peremptorily determines that the sale was ineffectual. Russell Dart was executor and trustee, and the powers of sale conferred upon him by the will of the testator could not be exercised in his own favor, either directly or indirectly. He could not be both vendor and purchaser at any price. He was, therefore, properly charged with the value of the stock. Upon the inquiry of what was the value, we think the best evidence which the case presents is the sworn inventory of the executors themselves." The court refers in its opinion to the fact that aside from the evidence furnished by the inventory, the testimony as to the value of the stock was undecisive and unsatisfactory. In the case at bar we have not only the sworn inventory of the executors as to the value of the good-will and plant, but we have positive evidence of the offer by Nostrand to pay such inventoried value for the good-will alone. The finding of the referee in this regard is overruled, and the account of the executors must be surcharged with the share of the estate in the difference between $300, the amount realized upon the sale, and $2,750, which I find to be a proper sum to be charged against the executors for the property.

In August, 1888, the executors issued a circular to the various legatees, stating that they were disappointed at the unavoidable delay that had occurred in closing the estate, explaining the causes therefor and stating that with a view to winding up the estate, so that the heirs and legatees might know what they would have to expect, and receive their income on the

residue, they had received an offer from their successors, Messrs. Nostrand & Company, to purchase from them all the outstanding consignment accounts at a discount of 33 1-3 per cent, they to pay cash for the same on a proper assignment or bill of sale. Enclosed with the circular was a consent for the signature of the legatees, to be returned to the executors. The only evidence in any way indicating bad faith in the conduct of the executors appears in this circular. The last paragraph reads as follows: "We prefer, however, to leave the matter to the heirs of Mr. Bach's estate to act and advise us as they think best; *we have no interest but theirs,* and if they prefer to await the further delays and expenses of liquidation, we shall be quite content to go on with the same. You must be the judges, and we shall act as you may all agree." There is no intimation contained in this circular that one of the members composing the firm of Nostrand & Company, which was making the offer, was one of the executors who signed the circular. This fact was not known to the legatees until a subsequent date. The assertion contained in the circular that "we have no interest," certainly was untrue and calculated to mislead. There is no doubt but that under the decision in Davoue v. Fanning (*supra*), and other cases cited, the sale of the said accounts might be disaffirmed by the legatees were it not for the consents which it is claimed estops them. If it were necessary, in order to sustain the conclusion that I have reached, to find that the concealment by the executor of his interest in the purchase rendered the consents ineffectual to establish the acquiescence of the legatees therein, I should do so,

but there is authority to sustain the proposition that, notwithstanding their acquiescence at the time, they may subsequently repudiate the transaction. In Munro v. Allaire, 2 Caine's Cases in Error, 183, cited in the opinion of Chancellor KENT, *supra*, an executor, with power to sell real estate, purchased of the widow, who was a devisee, and also one of the executors, her right in the acquired estate. The purchase was charged to have been fairly made, after long consultation, in which she was assisted by a friend, and that the executor gave a full price and more than then had been previously offered by another. It was held, nevertheless, that the trustee could not himself purchase. The finding of the referee with reference to the matter of accounts so sold by the executors is overruled and the exception taken is sustained. The course to be pursued with reference to these accounts is pointed out in Randall v. Errington, 10 *Vesey* 423, cited with approval in Davoue v. Fanning, *supra*. In that case it was held that the sale was fair and the purchase by the trustee at auction for a full price, but, inasmuch as he had subsequently sold a part at some profit, the court opened the sale at the request of the *cestui que trust* as to the parts not sold, and held the trustee to account for the profit on the part he had sold. The executors must, therefore, account to the estate for such portion of the accounts included in the sale as have been realized upon, and the decree to be ultimately entered herein must direct a sale of the interest of the estate in the accounts *unsold*, and if, upon such sale, they do not realize a sum larger than that realized by the executors, then the former purchase is to stand.

Among other assets sold by the executors were two pictures which were subsequently purchased by Mrs. Robinson, a daughter of Butler, the executor. Mrs. Robinson was not present at the sale, but the bids were made by the auctioneer himself, under instructions from her through Butler. Butler afterwards purchased one of the pictures from his daughter, and the other was purchased by the other executor at sums immensely below the inventoried value. The remarks above, with reference to the accounts and good-will, apply to these pictures, and the decree should direct a resale, as in the case of the accounts not realized upon.

The only remaining point to be considered relates to the excessive commissions allowed by the former decree. Counsel and referee are in error as to the manner in which this matter should be adjusted. The proper course is to first ascertain what the commissions should have been in the former decree, and the fund with which the executors are chargeable should be increased accordingly, but only so far as concerns the parties as to whom the former decree is not *res adjudicata*. The commissions should have been $923, and, so far as these minors are concerned, who are not bound by the former decree, the principal fund in which they are interested should be increased accordingly. The decree to be entered should contain appropriate recitals to that effect.