(121 App. Div. 202)

## In re SILKMAN et al.

(Supreme Court, Appellate Division, Second Department.　July 23, 1907.)

1. EXECUTORS—SALE TO EXECUTOR—VALIDITY.

　　A sale of a partnership. interest of decedent by a qualified executor to a person named in the will as an executor, but not yet qualified, is voidable.

　　[Ed. Note.—For cases in point, see Cent. Dig. vol. 22, Executors and Administrators, § 467.]

2. SAME—ACCOUNTING FOR PROFITS.

　　Where a wrongful sale was made by executors of a partnership interest, and specific restoration was impossible, it was proper to require them to account for the profits and the value of the good will.

　　[Ed. Note.—For cases in point, see Cent. Dig. vol. 22, Executors and Administrators, § 467.]

3. PARTNERSHIP—TRANSFER OF PARTNERSHIP INTEREST—SALES.

　　The conveyance by an executor of a partnership interest belonging to the decedent is a sale, and not a liquidation of the partnership.

4. EXECUTORS—APPOINTMENT—TIME AUTHORITY ATTACHES.

　　An executor's interest in the testator's estate vests at the latter's death, and when he qualifies his authority relates to the time his interest vested.

5. PARTNERSHIP—AGREEMENT—PAROL MODIFICATION—VALIDITY.

　　Where a partner who is entitled to 50 per cent. of the profits under a partnership agreement orally waives his right to that amount upon the distribution of a year's profits, such waiver does not bind him on a future division of the profits.

6. SAME—DISSOLUTION—DEATH OF PARTNER—DISPOSAL OF GOOD WILL.

　　When dissolution of a partnership is caused by the death of one of the partners, the same principles apply for the disposal of the good will as in other cases of dissolution, where no agreement has been made by the parties concerning it.

　　[Ed. Note.—For cases in point, see Cent. Dig. vol. 38, Partnership, § 563.]

7. SAME—COMPUTATION OF VALUE OF GOOD WILL.

　　In computing the value of the good will of a decedent's business at the time of his death, the basis should be the annual profits before his death.

8. EXECUTORS—MANAGEMENT OF ESTATE—LIABILITY FOR INTEREST ON FUNDS.

　　Before an executor can be charged with interest not received by him, it must appear that he might have received such interest by the exercise of reasonable diligence.

　　[Ed. Note.—For cases in point, see Cent. Dig. vol. 22, Executors and Administrators, § 423.]

Cross-Appeals from Surrogate's Court, Suffolk County.

Final.accounting of Theodore H. Silkman and others, as executors of Adolph F. Braidich.　From a decree of the Surrogate's Court, there were cross-appeals by Olga Blasig, residuary legatee, and by the executors.　Modified.

Argued before HIRSCHBERG, P. J., and WOODWARD, JENKS, and MILLER, JJ.

Edward M. Shepard, for contestant.
Edward W. Hatch, for executors.

JENKS, J.　These are cross-appeals from a final decree of the Surrogate's Court of Suffolk county in the accounting of the executors of Adolph F. Braidich.　So far as the appeal of the executors is concerned, we shall consider it upon their amended notice thereof.　Ob-

jections to the account were filed by Mrs. Olga Blasig, of Trieste, Austria, only heir and next of kin, and the residuary legatee. Many of the objections were sustained, with a consequent surcharging of the account. Some of them were rejected. The appeals have been argued with great learning and ability by prominent counsel, with exhaustive and elaborate briefs.

The principal question arises from a dealing with the interest of Mr. Braidich, the decedent, in his firm of Thurston & Braidich. The will directed the executors to wind up the interest of the testator in the firm within one year from his death. The testator died on March 4, 1902. The will was probated on April 15, 1902, and on that day Mr. Silkman alone qualified. By this transaction of May 1, 1902, there was transferred to Mr. Shaw, then the sole surviving partner in said firm, the entire interest of Mr. Braidich in the firm for $277,949.08. Mr. Young had an interest in the firm, and has now become a partner of Mr. Shaw. The final payment thereof is stated as of October 28, 1902. On May 27, 1903, letters were issued to Mr. Shaw and Mr. Young, who then qualified, and who now account. The learned surrogate made a conclusion of law "that the sale purported to be made" by the executor Silkman "to the said surviving partner and executor" Shaw was made in violation of the trust duties owed the said estate by the said Shaw and Young, "and was and is void as against the estate of the decedent and as against the said Olga Blasig."

It is contented that the surrogate erred in holding the transaction void. Of course, there is distinction between "void" and "voidable," which, though nice, may often be important. But "void" is used in the sense of "voidable." Anderson's Law Dict. In Somes v. Brewer, 2 Pick. 191, 13 Am. Dec. 406, the court say:

"Between the grantor and grantee in such cases, the technical difference between 'void' and 'voidable' is wholly immaterial. Whatever may be avoided may, in good sense, to this purpose, be called void, and this use of the term 'void' is not uncommon in the language of statutes and of courts."

See Mailhoit v. Metropolitan Life, 47 Am. St. Rep. 336, 87 Me. 374, 32 Atl. 989; Larkin v. Saffarans (C. C.) 15 Fed. 147; United States v. Winona & St. Paul R. R. Co., 67 Fed. 948, 15 C. C. A. 96; Beecher v. Marquette & P. Rolling Mill Co., 45 Mich. 103, 7 N. W. 695.

In his careful and elaborate opinion the surrogate wrote:

"I can therefore reach no other conclusion than that the sale * * * of the interest of the firm * * * was avoidable at the option of the residuary legatee, and that the executors must account to her," etc.

The objections of Mrs. Blasig in part were that the executors have failed to collect from Mr. Shaw the amount due for the decedent's interest in the good will, firm name, and leasehold, and that the interest in the assets which were sold or were stated to be sold was sold at an amount far below its value, and that, if the sale were recognized, the amount was far below the value thereof. In addition, the objections did challenge the sale as void. Mrs. Blasig has not appealed as to the theory of the decree. Strictly speaking, I think the sale was voidable. Boerum v. Schenck, 41 N. Y. 182; Merrick v. Waters, 51 App. Div. 83, 64 N. Y. Supp. 542, affirmed 171 N. Y. 655, 63 N. E. 1119.

The decree did not adjudge the sale void to the end of specific restoration. That was practically impossible, for there had. been sales of almost all of the merchandise acquired by the sale, and doubtless to hundreds of consumers. But the decree pronounced the sale wrongful, required the executors to account for the profits thereof, and in effect surcharged those profits and also the value of the good will. This disposition is in accord with the rule of Case v. Abeel, 1 Paige, 397.

Redfield on Law and Practice of Surrogate's Court (5th Ed.) p. 507, says:

"The cestui que trust may affirm the sale, and long acquiescence may amount to an affirmance; or he may repudiate it, and call upon the trustee to restore the property, or, if that has become impossible, to account for whatever benefit he has received from the purchase."

In Matter of Yetter, 44 App. Div. 411, 61 N. Y. Supp. 175, affirmed 162 N. Y: 615, 57 N. E. 1129, the court, per Barrett, J., say:

"The appellant was also charged with the sum of $1,200 for the lease and good will of the decedent's business, instead of $105, the sum for which they were sold at auction. This was clearly proper. The sale was made nominally to the appellant's son-in-law; but the latter almost immediately transferred the property to the appellant, and it is practically uncontradicted that the appellant was the real purchaser. He was thus accountable for the true value of the property. Ames v. Downing, 1 Bradf. Sur. 321."

In Ames v. Downing, quoted supra, the surrogate said:

"The trustee has, in the present instance, acted through the intervention of a third person, who holds the title, and I cannot pronounce a decree which will affect directly all the parties; but that is no reason why the sale should not, on this accounting, be treated as invalid, so far as to hold the trustee, who has been privy to the sale, responsible. Though there are some unusual circumstances marking the transaction, I am disinclined to make any particular criticism upon them, or to proceed on the ground of undervalue or want of fairness. I put the case simply upon the ingredient of the personal interest of the executor, which, as a trustee for sale, he had no right to allow to enter into the matter. He should have been careful to have kept his own personal interests entirely clear of the sale, and not to have meddled with it any way individually. Upon this dry doctrine, without imputing to him fraud in fact, I think the executor ought to be held liable for the value of the property at the time of sale."

See, too, Stiles v. Burch, 5 Paige, 132; Barker v. Smith, 1 Dem. Sur. 290; In re Bach's Estate (Sur.) 12 N. Y. Supp. 712; Ford v. Blount, 25 N. C. 516; Re Norrington, 13 Ch. Div. 654.

If it were important to be precise as to the term "void," then this court has the power to recast the decree in that respect. Matter of Westerfield, 61 App. Div. 419, 70 N. Y. Supp. 641; In re Kellogg, 104 N. Y. 648, 10 N. E. 152. But none need necessarily imply, and none would conclude, that the sale was absolutely set aside, with the effect of restoration, in view of the surcharge of the profits resultant from the resale and the surcharge of the value of the good will.

It is also 'contended that this transaction was not a sale, but a liquidation. The executors term it thus in their account. And the eminent counsel for the executors writes in his brief:

"The executors in this proceeding do not question the ordinary rule that a person acting in a fiduciary capacity cannot deal with a trust estate for his

own benefit; but they say that, admitting the general rule to be as stated, it does not apply to this case. The rule has no application to the case, for the reason that it was a liquidation, and not a sale. Shaw and Young dealt as individuals, not as executors or as trustees. They paid a large part of the value without waiting for it to be ascertained."

I do not take this view. "Liquidation," in its general sense, means "the act or operation of winding up the affairs of a firm or company, by getting in the assets, settling with its debtors and creditors, and appropriating the amount of profit or loss." Words & Phrases Judicially Defined, p. 4180, quoting 3 Cent. Dict. 3474. See, too, Martin v. Kirk, 2 Humph. 529; Garretson v. Brown, 185 Pa. 452, 40 Atl. 293. Mr. Silkman so dealt with Mr. Shaw that Mr. Shaw himself testifies:

"I came into possession of everything that was there. All there was of Mr. Braidich's interest I came into possession of."

He further testifies that he did this with the permission of Mr. Silkman, and that he made payments to Mr. Silkman "upon coming into possession of all the Braidich interests in that business." This was a sale. Moreover, Mr. Silkman was not, and never had been, a partner. As an executor he could not liquidate. Williams v. Whedon, 109 N. Y. 333–338, 16 N. E. 365, 4 Am. St. Rep. 460; King v. Leighton, 100 N. Y. 386, 3 N. E. 594; Emerson v. Senter, 118 U. S. 1–18, 6 Sup. Ct. 981, 30 L. Ed. 49; Secor v. Tradesmen's National Bank, 92 App. Div. 294–298, 87 N. Y. Supp. 181; Lindley on Partnership; Jacquin v. Buisson, 11 How. Prac. 394. Indeed, it is not easy to reconcile the statement that it was a liquidation with this other statement in the points of the learned counsel:

"Mr. Silkman also knew that Mr. Shaw * * * had the absolute right to retain entire control of the property and effects of the firm of Thurston & Braidich, and dispose of the same without any right of intervention of the executor of the Braidich estate, unless it became apparent that Mr. Shaw intended to deal improperly with the estate. A liquidation, if insisted upon by Mr. Shaw, might have extended over a period beyond that which Mr. Braidich in his will desired his interest in the firm to be wound up."

It is also contended that, when the executor Silkman dealt with Shaw and Young and agreed upon the price which should be paid for the property, he had the legal right to do so. If we view the transaction as if Mr. Shaw and Mr. Young were but surviving partners, and were only to be regarded as such on this accounting, there is most respectable authority for this proposition. Case v. Abeel, supra; Holladay v. Land & River Imp. Co., 57 Fed. 774, 6 C. C. A. 560; Schouler on Executors, § 345; Lindley on Partnership (Ewell's 2d Am. Ed.) *593; Parsons on Partnership (4th Ed.) p. 437, note. In Holladay v. Land & River Imp. Co., supra., Fuller, Circuit Justice, for the court, said:

"But the executor of a deceased partner, if not a member of the firm, may agree with the survivor that the share of the deceased may be ascertained in a particular way, or be taken at a certain value; and if the executor and the survivor in good faith come to an accounting respecting the partnership affairs, and settle the same as a final account, such settlement cannot be overhauled, except on the ground of fraud (or such unfairness as is equivalent thereto) or mistake. Colly. Partn. (6th Ed.) 382; Lindl. Partn. 1069; Sage v. Woodin, 66 N. Y. 578; Roys v. Vilas, 18 Wis. 174; Kimball v. Lincoln, 99 Ill.

578; Ludlow v. Cooper, 4 Ohio St. 1; Arnold v. Wainwright, 6 Minn. 358 (Gil. 241), 80 Am. Dec. 448."

In the note to the text stating the general rule in Parsons on Partnership, supra, it is said:

"Nor, in closing up the affairs of the firm, is there any such principle in equity that surviving partners cannot become purchasers from the representatives of the share of deceased partner. Chambers v. Howell, 11 Beav. 6, 12 Jur. 905."

And in the note on the next page it is said:

"Since the survivor is a trustee, not for the estate of the deceased, but for the firm, he may buy the interest of the deceased from his representative. Valentine v. Wysor, 123 Ind. 47, 23 N. E. 1076, 7 L. R. A. 788."

In Lindley, supra, it is said (bottom page 1311):

"A bona fide sale, however, by the executors to the surviving partners, can generally be made with safety if no surviving partner is an executor."

In Case v. Abeel, supra, well recognized as a leading case, it is said:

"It is therefore sufficient merely to advert to these general principles here. The surviving partner has the legal right to the partnership effects; but in equity he is considered merely as a trustee to pay the partnership debts and dispose of the effects of the concern for the benefit of himself and the estate of his deceased partner. He cannot, therefore, be permitted to make any gain or profit by the use of the partnership funds and effects for his own exclusive benefit. In this case, if the surviving partner had not stood in the situation of executor, he might have made a valid agreement with the personal representatives of his deceased brother to take the stock on hand at a fixed valuation; and whatever profit was made upon the bargain would have been his own exclusively. But one executor or trustee can make no valid agreement to purchase or take the trust property at a fixed valuation from his co-executor or co-trustee, without being liable for the profits, if any are made by the agreement."

It is clear that the surviving partner has no right to take the assets at a valuation. 2 Lindley on Partnership (Rapalje's Ed.) bk. 4, c. 3, § 252, p. 1001; King v. Leighton, supra. But that is not the question in the case at bar. But the obstacle in the executors' way is that if Mr. Shaw was not only a surviving partner, but was an executor of the deceased partner, the sale was voidable. I repeat the rule stated by Lindley, ut supra:

"A bona fide sale, however, by the executors to the surviving partners, can generally be made with safety, if no surviving partner is an executor."

See, too, Case v. Abeel, supra; Estate of Barlow, 15 N. Y. St. Rep. 721; Kimball v. Lincoln, 99 Ill. 578–586.

As executor Mr. Shaw was a trustee, and also for Mrs. Blasig (Blood v. Kane, 130 N. Y. 514, 29 N. E. 994, 15 L. R. A. 490). And the general principle applicable to all fiduciary relations (Scholle v. Scholle, 101 N. Y. 171, 4 N. E. 334) would apply to him if an executor (Pomeroy's Eq. Jur. [3d Ed.] §§ 960, 1077, 1078; Ten Eyck v. Craig, 62 N. Y. 420). I think that all of these gentlemen must be regarded as executors at the times of this transaction. As executors their authority came from the will itself. The letters were but evidence of their authority and rested upon the probate of the will. Hill v. Tucker, 13 How. (U. S.) 466, 4 L. Ed. 223; Hartnett v. Wandell,

60 N. Y. 346–350, 19 Am. Rep. 194; Williams on Executors (Randolph & Talcott's Ed.) p. 354; People ex rel. Gould v. Barker, 150 N. Y. 57, 44 N. E. 785. In Hill v. Tucker, supra, the court say:

"The executor's interest in the testator's estate is derived from the will, and vests from the latter's death, whatever may be the form which the law requires to be observed before an executor enters upon the discharge of his functions. When within the same political jurisdiction, however many executors the testator may appoint, all of them may be sued as one executor for the debts of the testator, and they may unite in a suit to recover debts due to their testator, or to recover property out of possession."

In Williams on Executors, supra, it is said:

"The probate is, however, merely operative as the authenticated evidence, and not at all as the foundation, of the executor's title; for he derives all his interest from the will itself, and the property of the deceased vests in him from the moment of the testator's death."

When they took the letters and qualified, their action related to the death of the decedent, and they must account just as if the transaction was subsequent to the issue of the letters and their qualification. See Vroom v. Van Horne, 10 Paige, 549, 42 Am. Dec. 94; Bennett v. Lyndon, 8 App. Div. 387, 40 N. Y. Supp. 786; Alvord v. Marsh, 12 Allen, 603; Williams on Executors (Randolph & Talcott's Ed.) p. 316, note; In re Ellen Farrell's Estate, 1 Tuck. 110.

There is another principle laid down in Williams on Executors, supra (volume 1, at page 462), as follows:

"Probate granted to one of several executors inures to the benefit of all. Where there are several executors, upon the grant of probate to one of them, it is usual to reserve power of making a like grant to the others. But this appears to be unnecessary, both because the probate already granted inures to their benefit and because they have a right to the grant, whether the power be reserved or not."

Moreover, these executors have come in to account as such trustees. Do they not thus admit their liability to account for such transaction? See Kellett v. Rathbun, 4 Paige, 107. It is true that in another part of the account they state that Mr. Silkman was the "acting' executor at the time"; but can they thus limit their admission, especially when they state unqualifiedly the receipt of the money resultant from this sale? Mr. Braidich could not compel his surviving partner to become his executor, and Mr. Shaw was free to renounce or not to accept the trust. If he had done either, then, so far as his executorship is concerned, the situation would have been radically different. Hence Valentine v. Duryea, 37 Hun, 429, which is repeatedly invoked by the executors, is not in point; for in that case C. Valentine "never was appointed executor," but was "superseded."

It is said that Mr. Silkman did exactly as he had a right to do at the time, and that there is "not the slightest evidence to justify the assumption that he knew that Shaw or Young, or either of them, would thereafter qualify." He knew that Shaw and Young had not revoked, nor declined. He must have known that they could qualify. And, finally, Mr. Shaw himself testifies that he did not qualify immediately, "because" he waited until after the "liquidation" of the firm; that there was no reason for the delay, except that Mr. Silkman thought

that it would be better for him to wait until he finished up the business. If this be true, how can it be said that qualification was an afterthought, or a change of disposition in Mr. Shaw, or that it came as a surprise to Mr. Silkman? Generally speaking, the right of Mrs. Blasig does not depend upon bad faith or inadequate price. Scholle v. Scholle, supra; Fulton v. Whitney, 66 N. Y. 555.

Case v. Abeel, supra, is recognized by the appellant as of high authority. Reference is made in the opinion to "these principles," which "are discussed at length in Davoue v. Fanning, 2 Johns. Ch. 252, in Rogers v. Rogers, 1 Hopk. Ch. 515, and in Hawley v. Cramer, 4 Cow. 717. It is therefore sufficient merely to advert to these general principles here." Now, in Davoue v. Fanning, supra, the court say (page 255):

"It is contended, on the part of the defendants, that this sale is not open to objection, inasmuch as it was at public auction, and bona fide, and for a fair price, and the purchase was not made for the benefit of his wife, who was one of the cestui que trusts, having an interest in the land. But I am of opinion that these circumstances do not vary the application of the general rule."

And the other cases cited go as far. Rogers v. Rogers, 1 Hopk. Ch. 594; Hawley v. Cramer, 4 Cow. 734, 735.

But it is true that the theory of the decree depends upon the question whether the evidence justifies the conclusion that there were any profits from the transaction. Case v. Abeel, and authorities supra. The position of the executors is, as I have said, if the sale is voidable, the measure of Mrs. Blasig's recovery is based upon the profit which was gained in the transaction. So, invoking Case v. Abeel, supra, they contend that:

"The evidence conclusively shows that Shaw paid full value for Mr. Braidich's interest in the firm business; and, as to the value of the merchandise, the surrogate so held."

Again they say:

"Tested by this standard, it appears that the learned surrogate has not found that the property in fact was worth more than the valuation placed upon it and for which payment was made. He did not surcharge the account with a penny upon the value of the merchandise, and we are now limiting our observations to that part of it."

I am at a loss to understand this assertion in the face of finding 11:

"That the actual value of the interest of the decedent in the firm of Thurston & Braidich, exclusive of the value of the good will and firm name, exceeded on 1st of May, 1902, the amount allowed therefor in the said sale; that such excess is included in and represented by the profits mentioned in the next succeeding finding."

The surrogate, it is true, did not surcharge any definite sum by finding 11, but for the reason therein stated. I think that the conclusion of the surrogate should not be disturbed. Mr. Silkman employed Mr. Martin, an accountant, to furnish a statement of the account of the firm. It does not appear that Mr. Martin had any qualifications, save as an expert accountant, and yet his instructions were to ascertain whether the prices Mr. Shaw was willing to pay were "fair and reasonable—from the books." He was not instructed to call in any as-

sistance because Mr. Silkman did not know anybody. Mr. Martin accepted without question or reference the prices as given to him by Mr. Shaw alone, and made the valuation upon them. Mr. Shaw says he was an expert, and that seems to be his naive excuse for thus dealing with Martin. Mr. Silkman sold on the valuation of Mr. Martin. Mr. Shaw bought at his own price. Mr. Silkman says that he was ignorant of this fact—in fine, he trusted blindly Mr. Martin, who was brought in only as an accountant; and Mr. Martin trusted Mr. Shaw, who with free hand fixed the prices that he was to pay to a man who had no practical knowledge of the business whatever. Although Mr: Silkman testifies that he instructed Mr. Martin to examine into the values, the written report to Mr. Silkman fails to show that he did so. He also testifies that he relied upon Mr. Shaw when the latter said to him that the price was fair. If the price was unfair, such reliance may go towards moral exculpation; but it certainly is no legal excuse for the neglect or imprudence. Misplaced confidence cannot shake off fiduciary fetters. I think that the surrogate was right in his finding that the actual value (exclusive of the good will and firm name) exceeded the amount allowed for the sale—in a word, that the valuation was a positive undervaluation.

I cannot in the compass of this opinion set forth an extended analysis of the long accounts or statements made both by the executors and the contestant, and of the testimony relative thereto and to the specific and repeated undervaluations asserted by the contestant. But one or two results of analysis may be stated. I use round numbers. The total profits for the year 1902 were $60,000; for the first four months, $11,000; for the remaining eight months, $48,000. For the first four months the profits were computed upon the proceeds of the sale of the merchandise to Messrs. Shaw and Young, and, of course, the Braidich estate shared therein. For the last eight months the profits for Messrs. Shaw and Young were computed on the gain of their sales over the purchase price paid to the Braidich estate. The profits for 1903 were $38,000, and for 1904 $42,000; but the rate of profit for the said eight months of 1902 would indicate an annual profit for that year of $73,000, and yet this profit was admittedly made upon a falling market. Again, the inventory which was the basis of the sale showed stock on hand $164,000. The sales therefrom were $201,000, and the goods unsold were worth $3,000. The gross profits of sales were more than 24 per cent. The personal net profits of sales of Messrs. Shaw and Young were more than 10 per cent. Inclusion of the goods unsold would make that profit more than 13 per cent. The estate of Mr. Braidich lost this profit perforce of this. There was no testimony forthcoming from the executors as to the actual value of this merchandise which Mr. Shaw and Mr. Young took over, outside of the explanations made by Mr. Shaw himself.

It is insisted that the surrogate erred in computing the Braidich interest at 50 per cent. The partnership articles provided for it. But the argument is that, as the articles were parol, there was a parol modification thereof. It is true that as the appellants point out, one of the counsel stated there "was an oral variation of it"; but he added, "That is a point that your honor will have to pass upon," so that there

is no concession upon the record. It appears that at the end of certain years there were variances. Mr. Roelker, the bookkeeper, testifies that when the profits of the year 1900 were to be divided Mr. Braidich handed back the showing, saying:

"Here is a division of the profits—so much for Mr. Shaw, so much for Mr. Young, so much for Mr. Rosevear, and so much for Mr. Roelker."

The paper was given to Mr. Shaw, and by him returned to Mr. Roelker. The surrogate admitted secondary evidence of the contents of it. By its direction the net profits were divided, in round numbers, $15,000 to Mr. Braidich, $15,000 to Mr. Shaw, $6,000 to Mr. Young, $4,000 to Mr. Rosevear, $31 to Mr. Roelker. In 1901 the profits were likewise divided; that is, in each year Braidich and Shaw, the partners, each received an equal share, namely, a fraction over 37 per cent., and the remainder was divided among employés. It is to be noted that, so far as the act of Mr. Braidich is concerned, he did not yield up any part of his rightful profits to his partner, and that as to the profits taken by the partners he took his ·50 per cent. The concession as to the amounts was not for the benefit of his partner, but was for the benefit of their employés. The reason for this does not appear; but it does not follow that Mr. Braidich thus modified the partnership articles, so as to preclude his future right to insist upon the rate named therein. It appears that throughout many years previous, from 1891, it had been the practice to vary the percentages, and we find that Mr. Braidich took as high as 59 per cent. and as low as 42 per cent. of the net profits, and that allowances were made of varying percentages to the employés. The question is, not whether the articles could be varied or modified by parol, or by practical construction, but whether there is evidence thereof upon the record. All that was before the learned surrogate was that there had been these variations or concessions or readjustments as to past years by the direction of the head of the firm (who furnished all the capital) for the benefit of the employés. But there is not the slightest proof but that the articles remained as drawn, nor is there any proof of an act of the partners which bound Mr. Braidich in any way to a future division of the net profits other than that prescribed. I think that the principle enunciated in Hayne v. Sealy, 71 App. Div. 418, 75 N. Y. Supp. 907, applies.

The court found that the profits of Thurston & Braidich from May 1 to October 28, 1902, were $36,245.70, and charged the executors with the percentage of Braidich upon that amount. Inasmuch as the practical result of the decree is to hold the executors for the profits of the sale, I think that the basis of the computation must be the amount of the merchandise actually taken over by the sale of May 1, 1902, together with the amount thereof remaining unsold. The statement furnished by Mr. Lombard and read in evidence by the executors shows that the estimated gross profits were $37,016.91, which, less $19,211.71, percentage of expenses to sales, left a net profit of $17,-805.20. This deductive sum represented salaries, wages, rent, insurance, interest, traveling, fire insurance, brokerage, sundries, and per centage compensation. But under the articles of partnership the per centage compensation of 25 per cent. is deductible from what is termed:

therein the "net profits," and such was the course pursued in the statements of the profits made in the various years. So that to the $17,-805.20, or three-fourths, to ascertain the "total net profits," there must be added another third of that sum, or, namely, $5,935.06. If to this be added the $3,732.64, representing the value of the stock unsold, there is obtained $27,472.90, representing the profits on the stock taken over by Shaw and Young. Instead, then, of charging the executors with the percentage of 50 per cent. on $36,245.70, it should be charged on $27,472.90.

The surrogate found that the value of the good will and firm name of Thurston & Braidich in October, 1902, was $93,987.60, and that on May 1, 1902, the value of the interest of said estate in the good will was still greater by the share of said estate in profits. He surcharged the executors' accounts with $46,993.80 therefor. The contention of the executors is that good will did not exist. In People ex rel. A. J. Johnson Co. v. Roberts, 159 N. Y. 79, 53 N. E. 689, 45 L. R. A. 126, the court, per Vann, J., cite many instances of the definition of good will, and the learned judge, after citation, says:

"Good will embraces at least two elements—the advantage of continuing an established business in its old place, and of continuing it under the old style or name. While it is not necessarily altogether local, it is usually to a great extent, and must, of necessity, be an incident to a place, an established business, or a name known to the trade."

The firm of Thurston & Braidich began business in 1883 at 130 and 132 William street, New York City. Mr. Thurston died in 1890. The business was continued by Mr. Braidich until 1891, when he took in Mr. Shaw as his partner. The business was moved in 1901 to the next door, 128 William street, but to a store in all respects similar to the old place. The business was the import and retail of vanilla beans, gums, and merchandise. The firm's customers were estimated by Mr. Shaw at from 1,100 to 2,000. But a small part of the sales were made in New York City, and less than 2 per cent. of the customers visited the store. The great part of the sales were upon mail orders, or upon orders obtained by salesmen. The salesmen used cards bearing the name of Thurston & Braidich, and scoured the country, keeping in touch as much as possible with the old customers, while seeking for new. As the business dealt with articles more or less used in food products, it was important that the goods were pure. Is there no difference between a business in such products, established for 20 years in substantially the same place, with a list of 1,100 to 2,000 customers, and bearing the same name, and a new business, started under a different name, having to make its way? The very fact that the business did not depend upon a display of goods emphasizes the importance of the repute and standing of the name. Was there no advantage in a traveling salesman visiting a customer in Denver and carrying the card of Thurston & Braidich, instead of that of an unknown firm? Was there no advantage in possessing a list of 1,000 consumers who had dealt in the past with Thurston & Braidich, and in seeking a continuance thereof, when the customer knew nothing more than that the same firm sought to sell goods to him? If the writers of mail orders or the foreign customers of Thurston & Braidich did not depend

upon the display of goods or on personal contact with the firm in New York, what drew their custom to that business house? Thurston & Braidich certainly had, in the words of Vann, J., supra, "a name known to the trade." In Churton v. Douglas, Johns. Eng. Ch. 174, Vice Chancellor Wood said:

"The name of a firm is a very important part of the good will of the business carried on by the firm. The person says: 'I have always bought good articles of such a house of business. I know it by that name, and I send to the house of business identified by that name for that purpose.' * * * That the name is an important part of the good will of a business is obvious, when we consider there are at this moment large banking firms and brewing firms and others in the metropolis which do not contain a single member of the individual name exposed in the firm."

Lord Eldon's famous definition, "The probability that the old customers will resort to the old place," is not so literal as to mean that the customers must actually come to the old place, but simply that old customers will continue. As the decree found, Mr. Shaw testifies that the death of Mr. Braidich made neither break nor change in the manner or substance of conducting the business. The name was continued, the old place was kept, the customers remained, the same bankers extended credit, and the same employés were retained. Mr, Braidich died, but there was no ripple in the current of the business. The bankers were notified, but there the announcement ended.

The learned counsel for the appellant says that in this case the proof shows that there was no kind or friendly feeling on the part of customers, unless they were getting a bargain. He refers to the testimony of Mr. Shaw, who testifies that in his business reputation for quality of goods was nothing, or for ·honesty or integrity was nothing, but it was simply a question of price; and to other testimony adduced by him. In Mellersh v. Keen, 28 Beav. 453, Romilly, M. R., said:

"I have no doubt that the evidence of the eight or nine bankers, who have said that it was worth nothing, may be perfectly true, in one sense, that nothing could have been more easy than to have sold it in such a way, that nobody would have given a penny for it. But the court is bound to look at it in this point of view: What it would have produced, if it had been sold in the most advantageous manner and under such circumstances that it would have produced the largest sum for all the parties interested?"

Good will, of course, does not keep the customers from buying in the lowest market. Barter is not conducted on philanthropic principles; but good will promises the business that it may see the return of old customers whom it has treated fairly in price and in quality. In the case at bar, as I have already shown, Mr. Shaw did not wind up the business and did not begin a new business. The business was continued in every detail and in every respect without even the change of a business card, a bill head, or the letter paper. In Williams on Executors (volume 3, p. 131) it is said:

"The good will of the decedent's business is to be accounted for as part of the assets of his estate (Matter of Randall, 2 Con. Sur. 29; Thompson v. Winnebago County, 48 Iowa, 155), and to be considered in valuing his interest in a continuing partnership business (Platt v. Platt, 42 Conn. 330)."

See, too, Matter of Yetter, supra; Slater v. Slater, 175 N. Y. 143, 67 N. E. 224, 61 L. R. A. 796, 96 Am. St. Rep. 605; Smith v. Everett, 27 Beav. 452;

Freeman v. Freeman, 86 App. Div. 110, 83 N. Y. Supp. 478; David v. Matthews, L. R. 1 Ch. Div. 1899; Rammelsberg v. Mitchell, 29 Ohio St. 22.

"When dissolution is caused by death of one of the partners, it seems now clear that the same general principles apply for the disposal of the good will as in other cases of dissolution where no agreement has been made concerning it by the parties." Allan on Good Will, 63.

But I do not think that the valuation of the good will made by the decree should stand. The learned surrogate wrote in his opinion that in the case at bar two years' purchase on the amount of profits was as little as should be allowed, and that he was by no means clear that the allowance should not be more liberal. He took the average annual profits for three years succeeding the death of Mr. Braidich, and calculated 50 per cent. of the annual profits for two years. I think that, while the process may be approved, the basis should be the annual profits before the death of the testator. For naturally it is the condition of the business at the time of the dissolution or death which should be the criterion. Neither the capital nor the efforts of the retired (or deceased) partner normally contribute to the profits of the after years, and certainly they cannot afford as safe or as fair a basis as that which I have indicated. Mr. Sedgwick, in his book on Damages (section 254) says:

"A basis for such an estimate is the proof of past profits."

In Broughton v. Broughton, 44 L. J. Ch. 526, the business was insolvent at the death of the partner, and the surviving partner, being executor, carried it on for eight years and then sold it for £1,700. Upon a bill filed on administration, the executor was charged for a moiety thereof. Jessell, M. R., held that the defendant was only liable to be charged with the value of the moiety of the good will at the death of the decedent. See, too, Giblett v. Reade, 9 Mod. 459. In Mellersh v. Keen, supra, where the dissolution was of December 31, 1858, the court adopted the calculation of the clerk based upon the three years ending on that date. "The value of good will," says Rich, J., for this court, in Von Au v. Magenheimer, 115 App. Div. 87, 100 N. Y. Supp. 661, "may be fairly arrived at by multiplying the average net profits by a number of years, such number being suitable and proper, having reference to the nature and character of the particular business under consideration, and the determination of such proper number of years should be submitted to and determined by the jury as a question of fact, dependent upon the evidence before them in each action." Under the authority of Kirkman v. Kirkman, 26 App. Div. 395, 49 N. Y. Supp. 683, this court may be regarded as competent to pass upon the value of the good will upon the data before it. See, too, Mellersh v. Keen, supra.

The business under the name of Thurston & Braidich had been established in 1883. In Mellersh v. Keen, supra, the court acted upon the basis of profits for the three years ending on December 31, 1858, saying it had no better data, and that the principle of the chief clerk was correct. In 1891 the firm as constituted at the death of Mr. Braidich was formed. During that period the greatest profits were in 1895, $75,000, and in 1898, $80,000, and the lowest were in 1893 and 1894, $30,000 respectively. In 1899, 1900, and 1901 they were in

round numbers $40,000, respectively. In 1902 they were $60,000. Adopting the exact profits of 1899, 1900, and 1901, the average annual profits were $42,120.62, which would also represent the figure arrived at by the process adopted by the surrogate, and which we approve (50 per cent. for two years).

I understand that it is conceded that the item of $1,639.63 was properly surcharged. I think that it was error to surcharge the account with the difference between 5 per cent. (exacted) and 6 per cent. upon the legacies advanced. In Redfield's Law and Practice of Surrogate's Courts (5th Ed.) p. 632, it is said:

"But an executor who withdraws productive funds, in order to pay legacies before they become due, is chargeable with the loss thus occasioned to the residuary estate; that is, the interest which might have been earned."

In McLoskey v. Reid, 4 Bradf. Sur. 340, after discussion, the surrogate summed up the reason for the rule thus:

"The executors must then, in my judgment, place the residuary legatees in the same plight and condition as if the general legacies had not been paid until they became due."

It appears that the funds used were lying in trust companies at 3 per cent. or 4 per cent. It seems to me that the burden was on the contestant to establish that the executor with reasonable diligence could have received 6 per cent. on such funds which at the lapse of the year he might be required to devote to the said purposes, before the surcharge can be sustained. Shuttleworth v. Winter, 55 N. Y. 624.

I have sought to describe conduct, not to characterize it. I may assume that Mr. Silkman thought that technically he could sell this interest to Mr. Shaw, or to Mr. Shaw and Mr. Young, becaues they had not then qualified as executors. I cannot think, however, but that it was understood that Mr. Shaw and Mr. Young would qualify when the sale had been carried through. It may be that Mr. Silkman thought that Mr. Martin would ascertain the fair valuation of the goods; but he knew that Mr. Martin was but an accountant, and for aught that appears he left Mr. Martin without suggestion, and then, ignorant himself of the business, he appears as accepting Mr. Martin's valuation as an accountant without question, without verification, without inquiry as to the method of its ascertainment, or what, if anything, Mr. Martin had done to determine that the prices named were fair. There is no proof that Mr. Silkman was directly benefited by one penny. But he is before the court in a fiduciary capacity, standing upon this sale. Acts of omission may harm the cestui que trust, as well as acts of commission. And such acts cannot be excused to the cestui que trust, whether they rest upon the plea of ignorance of details, press of other affairs, or confidence in men misplaced. One in a fiduciary capacity is not heard in court to say of his acts that he was ignorant of wrong, at least until he has shown that he sought with vigilance to know that he was right. I am not speaking of moral exculpation, but of legal liability. I cannot hold the executors excused in this matter of good will. In their account, under "Assets Undisposed of and Losses," they state:

"The interest of the testator in the good will of the business of Thurston & Braidich, as distinct from the use of the firm name, was not sold or disposed of, for the reason that the executor, Silkman, who was the acting executor at the time of the sale, in liquidation of the interest of testator in the firm of Thurston & Braidich, did not regard it as an asset of value. It could not be sold in the market, and the surviving partner, Mr. Shaw, would not buy it. When the original firm of Thurston & Braidich was dissolved by the death of Thurston, and the business continued by Braidich, a claim was made by the Thurston estate against Braidich as the surviving partner for the value of the alleged good will, and the said Braidich at that time advised with Executor Silkman, claiming that there was no value to the good will of the business, and he declined to pay, and never did pay anything therefor, $1,000."

And under their statement of facts they said:

"The question of the good will of the business arose, and upon the report of the accounting as to the nature and character of the business, and upon the advice of counsel, Executor Silkman was of the opinion that there was no market or other value to the good will of the business. The question was not a new one, because upon the death of Mr. Thurston, the former partner of Mr. Braidich, the Thurston estate made a claim upon Mr. Braidich for the value of the good will. Mr. Braidich declined to pay, upon the ground that there was no good will, and that the business could be conducted under any name or style without affecting its profitableness, and the result was that Mr. Braidich paid nothing to the Thurston estate for the good will, but did continue the use of the copartnership name under the statute."

In the inventory the good will was appraised at $1,000. Neither of the appraisers made any examination whatever. One of them testifies that there was much conversation and discussion over the matter, but that he never examined any of the books; that he did not know whether they ever obtained any information, except in the office of Mr. Silkman or his partner. He testifies they did not find out the profits or make any inquiry—they "didn't care"; in short, he shows their crass ignorance of the entire matter and their complete indifference to it. At most, the inventory and appraisal are but prima facie evidence of value. Matter of Mullon, 145 N. Y. 98, 39 N. E. 821; Zilkin v. Carhart, 3 Bradf. Sur. 376. Mr. Martin, the accountant who dealt with Mr. Shaw, put at the foot of his valuation returned to Mr. Silkman, which was the sole basis of the sale of the business to Mr. Shaw:

"The good will and leasehold interest (the lease is for five years at $5,000 per year, dated May 1, 1901) are not included in this summary."

On November 7, 1902, Messrs. Shaw and Silkman executed an instrument wherein the latter acknowledged that he had received from Mr. Shaw, the surviving member of the late firm of Thurston & Braidich the sum of $277,949.08 in full for the share and interest of the estate of the late Adolph F. Braidich in said firm and the assets thereof, and wherein it was provided that, in consideration of the acceptance of this sum from Mr. Shaw in full settlement of the claims of the estate of Adolph F. Braidich against Mr. Shaw for the interest of the said Braidich, by Mr. Silkman as said executor, Mr. Shaw for himself, his heirs, executors, and administrators, agreed that he and they would indemnify Mr. Silkman as said executor against all claims against the said Silkman, as executor, and the estate of said Adolph F. Braidich, deceased, which may be made by any one interested in said estate for

or on account of the good will of the said business. I fail to see how the executors are justified by the plea that when Mr. Braidich took over the firm business he did not pay for the good will and resisted the idea with success. There is no evidence in the record of these alleged facts. If there were, it would not establish that there was no good will in 1890, much less in 1902, and so have justified either supineness or appropriation. In the matter of the good will, let us assume that he supposed that it had but a nominal value. That supposition is no excuse for a failure to approach that question with the desire to ascertain the true value, and to make it, if possible, of substantial profit to the estate if that were possible.

If Mr. Shaw thought he was an ordinary purchaser, and if he regarded Mr. Martin as the seller, it was commercial and natural that Mr. Shaw would put the prices as low as he thought the seller would accept. I can readily suppose that Mr. Shaw thought that, not having qualified as executor, he had an opportunity to purchase at arm's length, and that he went about to improve it. But, despite all these things, when these executors return their acts as discharges of their trust, Mrs. Blasig may hold them to account if the result was unfair to her estate. 3 Williams on Executors, 238; Adair v. Shaw, 1 Sch. & Lef. 272; Walsham v. Stainton, 1 De G., J. & S., 689. Gray, J., writing for the court in Matter of Niles, 113 N. Y. 547, 21 N. E. 687, says:

"This matter of the administration of assets is one which is peculiarly within the cognizance of equity, and a Surrogate's Court, in adjusting the accounts of executors and administrators, is governed by principles of equity, as well as of law. Upson v. Badeau, 3 Bradf. Sur. 15. In the exercise of the statutory powers conferred upon him to direct and control the conduct and settle the accounts of administrators and executors, the surrogate is not fettered; nor is he prevented by any rule of law from doing exact justice to the parties. He is supposed to administer justice in each case within his jurisdiction, according as the equities of the case demand, within the confines only of statutory provisions."

Speaking of the obligation upon an administratrix, the learned judge says:

"Upon her, equally with her associate in the office of administration, rested the duty to be vigilant to guard the estate from waste, loss, and impairment. Having sought the office, while she remained in it, she could not stand by and see an improper use made of the assets, and thereafter claim immunity in her official capacity, or advantage in her private capacity, whether such claim should be grounded upon ignorance of her legal duties and rights, or upon her mistaken reliance upon her associate in office."

And again it is said:

"We hold, therefore, that just so far as Mrs. Miller had the means of knowing of her coadministrator's acts, and assented to or acquiesced in them, she is bound. The question is merely between the two. Where concurrence in the action of Niles can be proved, or, with adequate knowledge of it, she is proved to have assented expressly, or by her passiveness should be deemed to have acquiesced in it, as coadministratrix she is chargeable with its consequences."

Although the general principles so admirably expressed are further qualified to meet the circumstances in that case, the facts in the case at bar do not admit the application of those qualifications. The trans-

action was thoroughly known and understood, for all participated in it. The ignorant person was Mrs. Blasig alone.

The surrogate decreed that executor's commissions should be allowed to Mr. Silkman "upon the amount of $357,999.92, being the amount received and paid out by him," but not including the amount by which said account filed by said executors is surcharged. A majority of this court is of opinion that it would not be warranted to disturb this part of the decree.

The decree must be modified in accordance with this opinion, and, as modified, it must be affirmed, without costs. All concur.