(161 App. Div. 79)

### In re BALL'S ESTATE.

(Supreme Court, Appellate Division, Second Department.   March 6, 1914.)

1. TAXATION (§ 895*)—TRANSFER TAX—APPRAISAL OF GOOD WILL.

Evidence in the appraisal of the good will in determining the transfer tax on the estate of a deceased member of a firm examined, and *held*, that the surrogate erred in determining its value by computing the sum of the average net profits for three years, then deducting the value of the personal services of the decedent and multiplying the remainder by two, but that, in view of the nature of the business and the circumstances involved, its value should be computed by taking the average net profits for five years and from the proportionate share thereof of the partner involved deducting the value of the personal services, and the interest on the original investment, and multiplying the balance by three.

[Ed. Note.—For other cases, see Taxation, Cent. Dig. §§ 1714–1721; Dec. Dig. § 895.*]

2. GOOD WILL (§ 1*)—NATURE.

"Good will" has been described as the advantage or benefit acquired by an establishment aside from the value of the money or property employed therein, in consequence of the general public patronage and encouragement received from customers on account of its position or celebrity or reputation for skill, affluence, or punctuality, or other circumstances or necessities, or even from ancient partialities or prejudices.

[Ed. Note.—For other cases, see Good Will, Cent. Dig. § 1; Dec. Dig. § 1.*

For other definitions, see Words and Phrases, vol. 4, pp. 3128–3130; vol. 8, p. 7673.]

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

**3. TAXATION (§ 866*)—TRANSFER TAX—GOOD WILL.**

Good will is property and taxable as such under the Tax Transfer Law (Consol. Laws, c. 60 [Laws 1909, c. 62]) §§ 220, 243, amended by Laws 1910, c. 706, and Laws 1911, c. 732.

[Ed. Note.—For other cases, see Taxation, Dec. Dig. § 866.*]

**4. TAXATION (§ 895*)—TRANSFER TAX—GIFTS.**

Evidence considered, and *held*, that a purported gift of shares of stock of a corporation by a decedent to his sons, if not merely colorable, was at least not an absolute transfer of title, but that there was a retention of ownership and control by the decedent making the shares taxable to his estate.

[Ed. Note.—For other cases, see Taxation, Cent. Dig. §§ 1714–1721; Dec. Dig. § 895.*]

**5. TAXATION (§ 879*)—TRANSFER TAX.**

A gift of shares of stock not intended to become complete in either enjoyment or possession until after the death of the donor is subject to transfer tax on his death.

[Ed. Note.—For other cases, see Taxation, Cent. Dig. § 1702; Dec. Dig. § 879.*]

Appeal from Surrogate's Court, Suffolk County.

In the matter of the estate of Thomas R. Ball, deceased. From a decree of the Surrogate's Court appraising the estate under the acts in relation to the transfer tax, the Comptroller of the State appeals. Reversed, with directions.

Argued before JENKS, P. J., and BURR, THOMAS, RICH, and PUTNAM, JJ.

John R. Vunk, of Patchogue, for appellant.

John W. Boothby, of New York City (Noah C. Rogers and Alfred H. Holbrook, both of New York City, on the brief), for respondents.

BURR, J. Thomas R. Ball died December 21, 1911, leaving a last will, proved before the Surrogate's Court of Suffolk county on January 6, 1912. By this will he gave to his two sons all of his interest in the assets of the firm of "Best & Co.," including merchandise, accounts, bills receivable, patents, trade-marks, good will, leases, leasehold interests, and all other property, upon conditions not here important. He also made these sons his residuary devisees and legatees. In assessing the value of the taxable transfers under said will, the Surrogate's Court was called upon to determine the value of said good will. The tax appraiser reported its value to be $251,174.88. The Surrogate's Court reduced this to $92,219.28. The correctness of this decision is now before us for review.

[1] In determining its value, the learned surrogate computed the sum of the average net profits of the firm of Best & Co. for three years preceding the death of Thomas R. Ball, deducted therefrom a sum estimated to be equal to the value of the personal services of said Thomas R. Ball at the rate of $30,000 a year for said period, and multiplied the remainder by two. He claims to have found authority for this method of computation in the decision of this court in the case of Matter of Silkman, 121 App. Div. 202, 105 N. Y. Supp. 872.

[2] Mr. Justice Story says:

"Good will may be properly enough described to be the advantage or benefit which is acquired by an establishment beyond the mere value of the capital, stock, funds, or property employed therein, in consequence of the general public patronage and encouragement which it receives from constant or habitual customers, on account of its local position or common celebrity, or reputation for skill or affluence, or punctuality, or from other accidental circumstances or necessities, or even from ancient partialities or prejudices." Story on Partnership (7th Ed.) § 99; Boon v. Moss, 70 N. Y. 465, 473.

That many of the elements referred to exist in the case at bar may not be denied. At the time of testator's death, the firm was composed of himself and his two sons, T. Arthur Ball and Ancell H. Ball, but the will contains a recital that the latter had "no interest whatsoever in the assets of said business, but only in the profits thereof." For a long time there had been no one interested therein bearing the name of Best, and yet this name had been maintained as a thing of value. The reputation of the firm, particularly as a dealer in children's clothing and supplies, was extensive. Among its trade-marks were the words "Lilliputian Bazaar," and a very large portion of its business was of the character known as "mail order" business; that is, patronage from persons who did not actually visit its shops, but, by reason of its reputation, were accustomed to trade with it through the medium of written communications sent through the mail. Decedent manifestly considered this good will of value, for in the articles of copartnership into which he entered with his two sons in March, 1904, and which were renewed in October, 1907, and again in December, 1910, among other things he contributed to the capital of said copartnership the use of the "trade-marks, furniture, fixtures, good will," etc., owned by him in the conduct of the existing business of Best & Co., and there was contained in the copartnership articles an express covenant that no interest or title of any nature, kind, or description passed to either of the sons in the "trade-marks, good will," etc., but only the use thereof so long as the firm continued; and in his will, executed on November 16, 1906, and republished with a codicil thereto on October 4, 1909, he bequeaths these to his two sons.

[3] This good will is property, and, although intangible, the transfer thereof is taxable under the law relating to taxable transfers. Tax Law (Consolidated Laws, c. 60 [Laws of 1909, c. 62, as amended by Laws of 1910, c. 706, and Laws of 1911, c. 732] §§ 220, 243); Godley v. Crandall & Godley Co., 153 App. Div. 697, on page 713, 139 N. Y. Supp. 236; Matter of Dun, 40 Misc. Rep. 509, 82 N. Y. Supp. 802; Matter of Hellman, 174 N. Y. 254, 66 N. E. 809, 95 Am. St. Rep. 582; Matter of Vivanti, 138 App. Div. 281, 122 N. Y. Supp. 954, appeal dismissed 200 N. Y. 513, 93 N. E. 1134. The determination of the value of this intangible property is always difficult, and any rule adopted with respect to the same must of necessity be more or less arbitrary. In Allan on the Law of Good Will (page 85) the rule is thus stated:

"The usual basis of valuation is the average net profits made during the few years preceding the sale."

In Mellersh v. Keen, 28 Beavan, 453, Sir John Romilly, Master of the Rolls, determined that "the average of three years' annual profits" was a fair basis of value.

In Page v. Ratliffe, 75 Law Times Rep. (N. S.) 371, Mr. Justice Stirling, of the High Court of Justice, said:

"It is assessed at so many years' purchase."

· And in fixing the value of the good will of a brewery, he added:

"It seems to me that competition and a desire to exclude rivals in trade would lead a brewer to give not less than three years' profit."

In Von Au v. Magenheimer, 115 App. Div. 84, 100 N. Y. Supp. 659, this court said, speaking through Mr. Justice Rich, that as a general rule "the value of good will may be fairly arrived at by multiplying the average net profits by a number of years, such number being suitable and proper, having reference to the nature and character of the particular business under consideration," and that the proper number of years is not a question of law, but one of fact. In the same case, on a second appeal (126 App. Div. 257, 110 N. Y. Supp. 629), it was held not to be error to refuse to charge that in estimating good will by the net profits the number of years cannot exceed five.

In Matter of Keahon, 60 Misc. Rep. 508, 113 N. Y. Supp. 926, the value of the good will was determined by multiplying the average net profits for a series of years by three.

In Matter of Silkman, supra, the average net profits for the three years immediately preceding the testator's death was ascertained, and this sum, multiplied by two, was held, under the circumstances there disclosed, to be a fair basis of computation. But that it was not thereby intended to establish this as an inflexible rule of computation is clear from the fact that the writer of the opinion, the present Presiding Justice of this court, quotes with approval the language of Mr. Justice Rich in Von Au v. Magenheimer, supra.

It appears in the case at bar, from the balance sheet in liquidation, that the value of the entire assets of Best & Co., exclusive of good will, was $178,405.12, of which $137,710.96, or about 70 per cent. thereof, was in the ownership of Thomas R. Ball. The net profits for the years immediately preceding his death were, in 1907, $210,-911.66; in 1908, $142,845.94; in 1909, $165,033.80; in 1910, $130,-915.46. In the year 1911 there was a loss amounting to $67,620.32. In that year the firm of Best & Co. moved from 62 West Twenty-Third street, where it had been located for many years, to the northwest corner of Fifth avenue and Thirty-Fifth street, where it is now located. The effect of this change was not to diminish the yearly gross sales of the concern; on the contrary, they exceeded those of the previous year by about $156,000, and the average for the preceding years, from 1907 down, by a still greater sum. The expense account for 1911 was, however, greatly increased. But one very large item therein was the rent of the Twenty-Third street store, which was substantially unoccupied, and the lease for which had a year still to run, and which rent, over and above the amount received from subtenants, was $42,247.50. In addition, there was some outlay for actual moving

expenses, amounting to about $2,000, and a charge for fixtures in connection with fitting up the new store on Fifth avenue, relatively much greater than would have been the case if the firm had remained in West Twenty-Third street, judging from similar expenditures made in preceding years. The conditions for the year 1911 were so unusual that, to obtain a fair average of net profits, we feel justified in computing the same from the year 1907, so that the bad year at one extreme is offset by a good year at the other, with three intervening years showing approximately similar net profits. So computed, the average yearly net profits for the period were $116,417.31, of which Thomas R. Ball's share was $81,492.12.

Three factors may be said to enter into net profits: First, interest on the capital; second, personal services of the party; and, third, the reputation or good will of the concern. By the partnership agreement Thomas R. Ball was to receive 6 per cent. upon the capital invested by him. This amounts to $6,985.02. There is some evidence that the personal services of Thomas R. Ball were of the value of $30,000 per year. If we deduct from his share of average annual profits these two amounts, we have as the annual value of the good will, all of which belonged to him, the sum of $44,507.09. Strictly speaking, it might be a little more than this, since this is estimating its value upon the amount of decedent's share of the net profits only, and not upon those of his copartners also, although the entire good will was his property, and of this good will, as well as of his personal services, his copartners had the benefit during his life. If we deem the gross value equal to three years' purchase, we have as a result the sum of $133,521.27. Substantially similar results would follow if, from the average annual profits, we deduct 6 per cent. interest on the entire capital invested at the time of the devolution, to wit, $178,405, and salaries for all three parties, stated to be $60,000, and deduct the same from the entire net profits. The annual value of the good will thus computed would be $45,713.01, and three years' purchase of this would be $137,139.03. Therefore we deem the former figure, to wit, the sum of $133,521.27, as a conservative estimate of the value of such good will, and we accordingly find this to be the value thereof, and reverse the finding of fact of the Surrogate's Court that such value was only $92,219.28.

[4] The second question determined by the said Surrogate's Court related to ownership of stock in the Ball Realty Company. The Ball Realty Company was incorporated in the year 1906, with a capital stock of $100,000. It was a close corporation, having but four stockholders, Thomas R. Ball, his son Ancell H. Ball, his son T. Arthur Ball, and Charles H. C. Duncan, who was superintendent of Best & Co., and the "confidential man" of the concern. Apparently it was formed chiefly to be a holding company for the real property acquired, either in fee or upon lease, at the corner of Fifth avenue and Thirty-Fifth street, now occupied by the firm. Its present assets over liabilities are of the conceded value of $508,265.59. Although organized in 1906, no stock was actually issued until the following year. On August 15, 1907, six certificates were issued, as follows: No. 1 to Thomas

R. Ball for 500 shares; No. 2 to Thomas R. Ball for 490 shares; No. 3 to Charles H. C. Duncan for one share; No. 4 to T. Arthur Ball for one share; No. 5 to Ancell H. Ball for one share; and No. 6 to Thomas R. Ball for 7 shares. No other certificates of stock have since been issued to any person. According to the affidavit of Charles H. C. Duncan, submitted to the appraiser in June, 1912, upon the succeeding day the stock transfer upon the back of three of these certificates was signed by Thomas R. Ball, but the blanks thereon have never been filled up, nor has any transfer of the stock been made upon the stock book of the corporation. The affidavit states that certificates 1, 2, and 5 were thus indorsed. Certificate No. 5, for 1 share, had been issued to Ancell H. Ball, and not to Thomas R. Ball. As the same affidavit states, however, that these certificates were for 500, 490, and 7 shares, respectively, it may be that it was certificate No. 6 that was so indorsed by him. It also appears that, at some time not specified, the other certificates were also indorsed by the persons to whom they had been issued. On August 19, 1907, in the presence of said Duncan, according to his affidavit, Thomas R. Ball took certificate No. 1, for 500 shares, and put it in an envelope which had written upon it the words: "T. Arthur Ball, Aug. 19, 1907. 500 shares. B. R. Co."—and handed the envelope to T. Arthur Ball, and said, "I give you half of the stock of the Ball Realty Company." He then took certificate No. 2, for 490 shares, issued to him, certificate No. 3, for one share, issued to Duncan, certificate No. 4, for one share, issued to T. Arthur Ball, certificate No. 5, for one share, issued to Ancell H. Ball, and certificate No. 6, for 7 shares, issued to himself, put these in another envelope, which had written upon it the words: "Ancell H. Ball. Aug. 19, 1907. 500 shares, B. R. Co."—and handed it to his son Ancell, and said, "I give you one-half of the stock of the Ball Realty Company." He then said to Duncan, "Now you are a witness to my delivery of the shares of the Ball Realty Company to my two sons." One of the sons, the affiant cannot state which, then handed these envelopes to him, and he put them in a safe belonging to the firm of Best & Co., where they remained until after the death of Thomas R. Ball. They were locked up in a compartment of this safe, of which there were three keys. Duncan had one, H. Ball (if by this description is intended Ancell H. Ball) had another, and there is no evidence who had the third key. It may be that if this was the whole of the transaction, and there were no circumstances tending to contradict the inferences to be drawn therefrom, a completed gift inter vivos would be established.

[5] But, when we consider the entire evidence relating thereto, it scarcely admits of doubt that, if the transaction was not a mere pretext to evade the payment of the transfer tax, at least the gift was one not intended to become complete in either enjoyment or possession until after the death of the donor. In such case the transfer is subject to tax. Matter of Bullard, 76 App. Div. 207, 78 N. Y. Supp. 491; Matter of Jones, 65 Misc. Rep. 121, 120 N. Y. Supp. 862; Matter of Raleigh, 75 Misc. Rep. 55, 134 N. Y. Supp. 684.

Proceedings before an appraiser to determine the value of taxable

transfers of a decedent's property are quite informal.  After this affidavit by Duncan had been submitted, he was produced before the appraiser, for cross-examination by the comptroller, on November 26, 1912.  The stock book was offered in evidence, from which it appeared that the stock still stood in the names of the parties to whom it was originally issued.  At that time Duncan testified that he was still the owner of one share of stock, represented by certificate No. 3, which was included in the stock purporting to have been the subject of the gift to Ancell H. Ball.  At a subsequent date, December 4, 1912, the stock certificates were produced by Duncan, and offered in evidence by the comptroller, for the limited purpose of showing that no stamps had been affixed thereto.  At the date of the alleged transfer, in August, 1907, the Tax Law provided as follows:

"There is hereby imposed and there shall immediately accrue and be collected a tax as herein provided, on all sales, or agreements to sell, or memoranda of sales, or deliveries, or transfers, of shares or certificates of stock, in any domestic or foreign association, company or corporation, made after the first day of June, nineteen hundred and five, whether made upon or shown by the books of the association, company or corporation, or by any assignment in blank, or by any delivery, or by any paper or agreement or memorandum or other evidence of transfer or sale whether entitling the holder in any manner to the benefit of such stock, or to secure the future payment of money or the future transfer of any stock, on each share of one hundred dollars of face value or fraction thereof, two cents.  *  *  *  The payment of such tax shall be denoted by an adhesive stamp or stamps affixed as follows: In a case where the evidence of transfer is shown only by the books of the company the stamp shall be placed upon such books; and where the change of ownership is by transfer of a certificate the stamp shall be placed upon the certificate; and in cases of an agreement to sell or where the transfer is by delivery of the certificate assigned in blank there shall be made and delivered by the seller to the buyer a bill or memorandum of such sale to which the stamp provided for by this article shall be affixed; and every bill or memorandum of sale or agreement to sell before mentioned shall show the date thereof, the name of the seller, the amount of the sale, and the matter or thing to which it refers, and no further tax is hereby imposed upon the delivery of the certificate of stock, or upon the actual issue of a new certificate when the original certificate of stock is accompanied by the duly stamped memorandum of sale."  General Laws, c. 24 [Laws of 1896, c. 908, as amended Laws of 1905, c. 241, and Laws of 1906, c. 414] § 315.

In this case there is no evidence of transfer shown on the books of the company, and, if there was any change of ownership, the evidence of the payment of the tax must be found in the stamps placed upon the certificates thereof.  The same act further provides that:

"No transfer of stock made after June first, nineteen hundred and five, on which a tax is imposed by this article, and which tax is not paid, at the time of such transfer shall be made the basis of any action or legal proceeding, nor shall proof thereof be offered or received in evidence in any court in this state."  Id. § 323.

If the point is properly raised, failure to pay the tax thus imposed at the time of the transfer of stock is sufficient to defeat a claim to title arising therefrom, and proof shall not be received in any court of this state respecting the same.  Bean v. Flint, 138 App. Div. 846, 123 N. Y. Supp. 385, affirmed 204 N. Y. 153, 97 N. E. 490; Sheridan v. Tucker, 145 App. Div. 145, 129 N. Y. Supp. 18.  It is true that in Bean v. Flint, supra, the Court of Appeals held that the provisions

of the statute did not impose upon the transferees of stock, as a condition precedent to a good pleading for a cause of action arising out of such transfer, the duty of affirmatively showing the affixing of stamps, but that the failure so to do must be set up as a defense.

In the case at bar there were no pleadings. The alleged transferees are claiming as against the estate of Thomas R. Ball, which is the record owner of the stock upon the books of the company, solely through the transfer above referred to. While it is true that in the first instance the affidavit of Duncan was received as his direct examination, as soon as it appeared through cross-examination that no stamps had been affixed to the certificates themselves at the time of the alleged transfer, the comptroller moved to strike out his direct testimony, and this motion was, we think, improperly denied. Not only, then, are the alleged transferees without any competent evidence of such transfer, but the remaining evidence in the case affirmatively establishes that none of the parties contemplated that this transfer should be effective at the time that it is alleged it was made. For four years thereafter the affairs of the corporation were conducted precisely as if Thomas R. Ball were still the owner, not only of a majority, but substantially of all, of the capital stock of the company. He was re-elected director, and thereafter president, from year to year. It is true that the certificate of incorporation provided that a director need not be a stockholder, but the by-laws of the corporation were not put in evidence, and we are not informed whether this privilege was availed of. Far more significant, however, than this or any other omission on the part of the transferees is the affirmative acts of the stockholders, including the said T. Arthur Ball and Ancell H. Ball. Although, if this was a bona fide transfer to take effect in possession and enjoyment at once, between 1907 and 1911 Thomas R. Ball was not the owner of a single share of stock, nor indeed was any other person except his sons, by a unanimous vote of all the directors and the four original stockholders above named Thomas R. Ball was given sole authority to acquire the real property necessary for the use of Best & Co. at the corner of Fifth avenue and Thirty-Fifth street, or his previous purchases of a portion thereof, without express authority, were subsequently ratified. Still more significant was the action of the same original stockholders and directors at a directors' meeting held January 12, 1911. It would appear that prior to December 28, 1910, Thomas R. Ball had advanced large amounts of money out of his own funds toward the acquisition of said property. On the latter date, in the presence of Mr. Duncan, a written instrument was executed by Thomas R. Ball, which, among other things, contained a recital that he was a "large stockholder in the Ball Realty Company," and that he was "desirous of conserving its resources, with a view of making valuable the stock of said Ball Realty Company and insuring its financial stability." Thereupon he assigned by said instrument to said company any and all claims which he had, "or might have by reason of any moneys advanced by him on account of either of the properties aforesaid, or which may be advanced by him in the future in connection with completing the building erected at the northwest cor-

ner of Thirty-Fifth street and Fifth avenue." He thereupon, by the same instrument, released the said company from all claims and demands of every nature, kind, and description whatsoever. This release was on motion of Ancell H. Ball accepted, and the minutes of the meeting contained a recital in connection therewith that at that time Thomas R. Ball was a "majority stockholder in said company." The attempted explanation of these entries does not impress us forcibly. The lawyer who drew the release states that he drew it at the request of Thomas R. Ball, and that he "did not know at the time that he had given his stock in the concern to his two sons." It may be that Thomas R. Ball was likewise ignorant that any effect would be given to the alleged transaction of August 17, 1907, which would prevent him from being a "majority stockholder" during his lifetime. T. Arthur Ball testifies that according to his recollection the paper was read at the directors' meeting, but "no particular attention was paid to the wording of it," because "the meetings of the Ball Realty Company were more or less perfunctory, and the company was entirely a family affair." It certainly did not affect the "entire family," if Thomas R. Ball was no longer a stockholder therein. Ancell H. Ball also testified that the company was "entirely a family affair," and he does not recollect that the release was even read at the meeting. Charles H. C. Duncan also thus testifies, and that the minutes of the meeting "were written up by Mr. Barrett, who had charge of the records of the Ball Realty Company and was present at the meeting." But Mr. Barrett was not called as a witness, nor is there even an affidavit from him that the minutes which he thus transcribed did not correctly set forth exactly what occurred. The two sons of Mr. Ball are claiming large benefits through this release to a company of which they are now at least the principal stockholders. We are deprived of the testimony of Thomas R. Ball as to the accuracy of the recitals contained in it. Under such circumstances, so long as the former retained the benefit, it is not inequitable that they should be bound also by the recital.

We find, therefore, that the stock of the Ball Realty Company was not transferred by any assignment to take effect in possession or enjoyment during the lifetime of Thomas R. Ball, and that the transfer thereof is taxable, and we reverse the finding of the surrogate to the contrary.

The decree of the Surrogate's Court of Suffolk county is reversed, with costs to the appellant, payable out of the estate, and the proceedings are remitted to said Surrogate's Court to fix the transfer tax in accordance with this opinion. All concur.