Matter of Ball, 161 App. Div. 79, 146 N. Y. Supp. 499. The profits or loss for the years immediately succeeding that in which the decedent died should not be used as a basis for calculating the average profits. Matter of Silkman, 121 App. Div. 203, 105 N. Y. Supp. 872, affirmed 190 N. Y. 560, 83 N. E. 1131. The net profits upon which the value of the good will is based are the profits remaining after deducting 6 per cent. interest on the capital employed in the business. Von Au v. Magenheimer, 126 App. Div. 257, 110 N. Y. Supp. 629; Matter of Ball, supra. The appraiser's report shows that he omitted to make this deduction in ascertaining the average annual profits.

[4, 5] The number by which the average annual profits, as so ascertained, should be multiplied in order to determine the value of the good will is dependent upon the nature of the business, the length of time during which it has been conducted under the particular name, the extent to which it has become known to the public through advertising or otherwise, how much of its success may be attributed to the personality of the decedent, and other considerations of a like character. While the record does not disclose the date of incorporation of the A. T. Demarest Company, it contains a reference to the business of the company in the year 1899, so that it was in existence at least nine years prior to the date of decedent's death. It appears, however, that for many years prior to his death he did not take any active part in the management of the business. Under these circumstances it would appear that the reasonable value of the good will for the purpose of the transfer tax would be three times the average annual net profits. Matter of Ball, supra.

The order fixing tax will be reversed, and the appraiser's report remitted to him for correction as indicated.

---

(92 Misc. Rep. 637)

In re McMULLEN'S ESTATE.

(Surrogate's Court, Bronx County.  December, 1915.)

1. TAXATION ⬪895—CORPORATE STOCK—VALUE—EVIDENCE.
    Where the public administrator advertised a sale of corporate stock in four newspapers in circulation among those most likely to be interested in the purchase of such stock, and in consequence the sale was well attended and the bidding fairly active, and it was not contended that there was any understanding or agreement among the bidders to limit the amount of their bids, the price at which the stock sold represented its value at the time of its sale.
    [Ed. Note.—For other cases, see Taxation, Cent. Dig. §§ 1714–1721; Dec. Dig. ⬪895.] .

2. TAXATION ⬪900—TRANSFER TAX—VALUATION OF CORPORATE STOCK—EVIDENCE.
    On appeal from an order assessing a transfer tax on corporate stock valued by the appraiser at $78 per share, held that the evidence required a finding that a fair value of the stock on the date of decedent's death was $44 per share.
    [Ed. Note.—For other cases, see Taxation, Cent. Dig. §§ 1722, 1723; Dec. Dig. ⬪900.]

⬪For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

**3. TAXATION ⬤⟾895—TRANSFER TAX—VALUATION BY APPRAISER.**

Under Tax Law (Consol. Laws, c. 60), § 230, relative to the valuation of transfers by the appraiser, the value for transfer tax purposes is to be estimated as of the time of death, and not the time of a subsequent sale.

[Ed. Note.—For other cases, see Taxation, Cent. Dig. §§ 1714–1721; Dec. Dig. ⬤⟾895.]

**4. TAXATION ⬤⟾895—TRANSFER TAX—VALUATION OF CORPORATE STOCK—EVIDENCE.**

In ascertaining the value of corporate stock not listed, which was sold about 15 months after the death of testatrix at an administrator's sale, under conditions fixing the market value thereof at that time, the appraiser should have considered the price received at such sale, together with any circumstances exercising depressing effect on the value of the stock at that time, and the prices received at other sales of stock of the same corporation.

[Ed. Note.—For other cases, see Taxation, Cent. Dig. §§ 1714–1721; Dec. Dig. ⬤⟾895.]

**5. TAXATION ⬤⟾895—TRANSFER TAX—VALUATION OF CORPORATE STOCK.**

Where, in proceedings by the transfer tax appraiser to fix the value of corporate stock, there was evidence, not only as to the price received for the stock at a public sale and the price received at other sales of stock of the same corporation, but testimony of an officer of the corporation relative to such value, it was error for the appraiser to limit himself entirely to a calculation of the assets and good will, though it appeared that the profits of the corporation during its existence were large; resort to the method of fixing value by ascertaining the value of assets and good will being permissible only when there are no sales from which it can be ascertained.

[Ed. Note.—For other cases, see Taxation, Cent. Dig. §§ 1714–1721; Dec. Dig. ⬤⟾895.]

**6. TAXATION ⬤⟾895—TRANSFER TAX—VALUATION OF CORPORATE STOCK—GOOD WILL.**

Where, in ascertaining the value of corporate stock for the purpose of a transfer tax, it is essential to ascertain the value of the company's good will, the value of the good will may be ascertained by taking a number of years' purchase, the number depending upon the facts of the particular case, and not being governed by any fixed rule, and multiplying the average annual profits thereby.

[Ed. Note.—For other cases, see Taxation, Cent. Dig. §§ 1714–1721; Dec. Dig. ⬤⟾895.]

**7. TAXATION ⬤⟾895—TRANSFER TAX—VALUATION OF CORPORATE STOCK—GOOD WILL.**

Where the stockholders of a company were given the privilege of subscribing for stock of a new company of a different name, to which their company transferred certain personalty, fixtures, and the good will of its business in certain vicinities, under an agreement binding it not to compete with the new company for three months only, this did not in effect make the new company a continuation of the old one, so as to authorize time during which the old company was in business prior to the organization of the new company to be considered in estimating the value, for transfer tax purposes, of the good will of the new company.

[Ed. Note.—For other cases, see Taxation, Cent. Dig. §§ 1714–1721; Dec. Dig. ⬤⟾895.]

**8. TAXATION ⬤⟾895—TRANSFER TAX—VALUATION OF CORPORATE STOCK—GOOD WILL—PROFITS.**

:Where, in ascertaining the value of corporate stock for transfer tax purposes, it is essential to first ascertain the value of the good will of

the corporation, the valuation of the good will should be based on a calculation of profits before death of decedent, and the life of the corporation is one of the elements to be considered.

[Ed. Note.—For other cases, see Taxation, Cent. Dig. §§ 1714–1721; Dec. Dig. ⊕⇒895.]

In the matter of the transfer tax upon the estate of Mary McMullen, deceased. From an order assessing the tax, the next of kin of decedent appeal. Appeal sustained, and order reversed.

See, also, 85 Misc. Rep. 661, 148 N. Y. Supp. 1092.

Gordon & Rogers, of New York City, for appellants.
John Boyle, Jr., of New York City, for respondent.
Ernest E. L. Hammer, public administrator, pro se.

SCHULZ, S. The next of kin of the decedent appeal from an order entered upon the report of the transfer tax appraiser.

The decedent at the time of her death was the owner of 232 shares of the capital stock of the Central Dairy Company, a corporation engaged in dealing in milk and dairy products. She died on January 18, 1914. Letters of administration were issued to the public administrator on September 8, 1914, and the shares of stock were sold on April 20, 1915. The par value of the stock was $50 per share, and at the sale 140 shares were sold at $37 per share and 92 shares were sold at $36 per share.

The appraiser valued the shares of stock at the sum of $78 per share. He arrived at the said amount by giving each of the shares a value of $36.92, based upon the physical assets of the company. To this he added the sum of $49.76 per share for good will, thus fixing the gross value of each share at $86.68. From this amount he allowed 10 per cent. deduction for depreciation.

The appellant contends that this valuation is unjustified, and, as there is no dispute about the value of the physical assets, the questions which remain are whether the appraiser was warranted in giving no weight at all to the testimony offered to show the value at the time of the transfer, and to the evidence of the actual sales prices of the shares under consideration, and others sold during the life of the corporation, and, if so, whether he erred in his method of arriving at his valuation of good will.

The corporation in question was organized in May, 1912, with a capital stock of $600,000. The outstanding capital stock amounted to $533,450, evidenced by 10,669 shares. From the date of its incorporation to February, 1915, there were some 28 transfers of stock. The sales made nearest to the date of the death of the decedent were one of 53 shares, purchased by the son and daughter of the treasurer in July, 1913, at $25, and one of 84 shares which were sold at $30 per share in December, 1913. The treasurer of the company testifies that the shares of stock bought by his son and daughter were a bargain and below the market price, and that in his opinion the same were worth $43 or $44 per share in July, 1913, and $40 to $41 per share in January, 1913, and a few dollars more in January, 1914.

[1, 2] The sale of the shares now in question was conducted by the public administrator and took place 15 months after the date of the death of the decedent. He advertised in four newspapers, two of which are published and circulate in the county of Bronx, the third was the New York Law Journal, and the other a paper devoted to and being the organ of the milk and creamery business, read by those in that line of business who would be most familiar with stock of this character and presumably interested in its purchase. In addition to this, the public administrator caused to be mailed a notice of the sale to each of the stockholders of the corporation, and upon the record it has been stipulated that the notice thus given on April 15, 1915, was due and timely.

In my opinion the public administrator used diligence and good judgment in advertising the sale and in giving notice to people who would in the ordinary course of affairs be most familiar with the value of the stock, and hence be most likely to be interested in its purchase. The results showed this for it appears that there were in attendance at the time of the sale between 25 and 35 persons.

The sale was conducted at public auction, and before the stock was sold the report of an expert accountant, who had examined the books of the company at the instance of the appraiser, was read to the assembled prospective bidders. The shares were sold in blocks of 10, with the exception of the last block offered, which consisted of 12 shares. The bids upon the first lot offered began at $25 per share, and went up gradually to $37 per share. Thereafter 13 more blocks were sold at that figure. Then 8 blocks were sold at $36 per share each, the bids having begun at $25 for each share and advancing to that figure, and the final block of 12 shares was also sold at $36 per share. The testimony is that there were 7 or 8, or possibly 10, bids. Eight people bought stock. There is no evidence of any understanding or agreement among the bidders to limit the amounts of their bids, and no contention that there was such an agreement. I believe that the sale was properly conducted.

I am satisfied that if, in the opinion of the stockholders present at this auction sale, the shares were worth more than they brought at that time, and it seems to me that the stockholders of all others should have known what they were really worth, the probabilities are very strong that they would not have stood by and seen them sold at a sacrifice. If, therefore, the amount realized at a public auction, after due and proper advertising, and conducted in a proper and legal way, is any criterion of market value, and in my opinion it is, then the prices which were realized at the time of the sale in question represented the value of the shares of stock at the time of the sale, and I so conclude.

[3] The value at the time of sale is not that upon which the tax is fixed, however. The transfer which is taxed is that which takes place at the time of death, and it is the fair market value at that time which forms the basis of the tax. Laws of 1909, c. 62 (Consol. Laws, c. 60) § 230. See Matter of Penfold, 216 N. Y. 171, 110 N. E. 499, recently decided by the Court of Appeals, in which many cases to that effect are cited.

[4] Under my direction the appraiser received testimony as to the public sale, but he frankly states that he gave it no weight because it was so long after the death of the testatrix. From the uncontradicted testimony of the treasurer it appears that the condition of the company at the time of sale was better than it was at the time of the death of the decedent, and he intimates that the stock was worth more in his opinion at the time of the public sale than at the time of the death of the testatrix.

While there are decisions to the effect that remote sales are not binding on the appraiser as to the value of the security at the date of death, I do not believe that they go so far as to hold that, where the shares under consideration were sold in a manner and under conditions which fix the market value thereof 15 months after the date of death, and which may throw light upon their value at the time of death, the appraiser must close his eyes entirely to them in appraising property whose market value must of necessity be at best only an approximation. See Marvin v. Medberry, 13 Wkly. Dig. 544; Matter of Roos, 90 Misc. Rep. 521, 154 N. Y. Supp. 939.

Under those conditions I believe that the sale mentioned should have been considered by him, not as necessarily conclusive, but as one of the sales which, together with the others made during the life of the corporation, might have aided him in fixing the market value which is the subject of the tax. Matter of Smith, 71 App. Div. 602, 76 N. Y. Supp. 185.

It is urged that when the shares were sold the European war was in progress, and that this had some effect. The stock is not listed and not dealt in on any exchange, and the business was one which I do not believe was directly affected by the war. It may be, however, that the latter exercised a depressing effect on the value of these shares of stock, and the appraiser, of course, had a right to consider this possibility.

[5] Apparently the other sales made during the life of the corporation were not considered by the appraiser, nor was the testimony of the officer of the company, which in my opinion was entitled to some weight, because unimpeached and uncontradicted, and given by one who it appears from his testimony was fully conversant with the affairs of the corporation. Cabble v. Cabble, 111 App. Div. 426, 97 N. Y. Supp. 773. The appraiser limited himself entirely to a calculation of the assets and an estimate of the good will in fixing the value of the various shares. In this, I think he erred; he should, in my opinion, have also considered the prices brought at the other sales, and the testimony of the treasurer referred to. The fact that the returns to the shareholders from the profits of the corporation during its 20 months of existence would be large of itself does not give the appraiser the authority to ignore actual sales of the stock. Matter of Smith, supra. The method of fixing value by ascertaining the value of assets and good will should only be resorted to when there are no sales from which it can be ascertained.

Considering all of the sales and the testimony of the treasurer as to the value and allowing for a possible depression between the date

of death and of the public sale on account of the existence of the European war, I am of the opinion that a fair value of said shares for purposes of taxation on the date of decedent's death was $44.

[6] If the appraiser was right in giving no weight to the sales, public and private, nor to the opinion of the treasurer of the company, then we come to a consideration of the method adopted by him in ascertaining the value of the good will. During the 20 months of the corporation's existence, the profits were large, and the appraiser has estimated the value of its good will by taking a 6 years' purchase on the average net annual profit over an allowance of 6 per cent. on capital invested. The general method followed by him for ascertaining the value of good will, namely, taking a number of years' purchase and multiplying the average annual profits thereby, has received the sanction of courts of original and appellate jurisdiction. Matter of Silkman, 121 App. Div. 202, 105 N. Y. Supp. 872; Von Au v. Magenheimer, 115 App. Div. 84, 100 N. Y. Supp. 659; Id., 126 App. Div. 257, 110 N. Y. Supp. 629, affirmed 196 N. Y. 510, 89 N. E. 1114.

[7] Hence it only remains to consider whether the number of years' purchase which the appraiser took was, under the circumstances, warranted. He justifies his taking a 6 years' purchase, although the corporation was only in existence for 1 year and 8 months, by the contention that it was carrying on the business of the Mutual Milk & Cream Company. The latter corporation was organized in 1899 or 1900, and upon the organization of the Central Dairy Company as stated in May, 1912, the stockholders of the Mutual Milk & Cream Company were given the privilege to subscribe for stock in the new Central Dairy Company. The Mutual Milk & Cream Company then transferred to the Central Dairy Company certain personal property, fixtures, and the good will of the wholesale business of the Mutual Milk & Cream Company in the boroughs of Manhattan and the Bronx and of all wholesale routes of said company, excepting certain contracts with some 70 firms named. The said agreement, however, contained a provision that nothing therein contained should be held or construed as limiting or restraining the right of the parties to compete in the wholesale milk business after a date about 3 months thereafter.

It appears that, in consideration of the Mutual Milk & Cream Company agreeing not to compete with the Central Dairy Company in the wholesale routes for 3 months, the Central Dairy Company paid the sum of $62,500. The new company, therefore, was not doing business under the name of the old company, and after the expiration of 3 months might be forced to compete with the old company. Under such circumstances, I do not see force in the contention that it was practically the old corporation and enjoyed its good will.

In the case of Commissioners of Inland Revenue v. Muller & Co.'s Margarine, Ltd., [1901] L. R. App. Cas. 217, at 223, Lord Macnaghten defined good will as follows:

"It is the benefit and advantage of the good name, reputation, and connection of a business. It is the attractive force which brings in custom. It is the one thing which distinguishes an old-established business from a new business at its first start."

And in People ex rel. A. J. Johnson Co. v. Roberts, 159 N. Y. 70, 53 N. E. 685, 45 L. R. A. 126, the Court of Appeals cites and quotes from a number of English cases and then observes:

"Good will embraces at least two elements, the advantage of continuing an established business in its old place, and of continuing it under the old style or name. While it is not necessarily altogether local, it is usually to a great extent, and must of necessity be, an incident to a place, an established business, or a name known to the trade."

In the matter before the court, the name under which the new corporation carried on business was not the same as that of the old firm. There were no trade-marks, brands, or other distinguishing business devices of the old firm used by the new one, and, while the term "good will" was used in the instrument of transfer, the fact appears to be that the old company gave the new one the right to do business for 3 months with certain of its customers without molestation from or competition with the old corporation. When the 3 months were over, the old company had the right to compete with the new one, and certainly under such conditions the latter cannot be said, at least after that time, to have enjoyed the good will of the former.

[8] Good will should be based upon a calculation of profits before the death of the decedent (Matter of Silkman, supra), and the life of a corporation should be one of the elements considered (Matter of Demarest, 157 N. Y. Supp. 653). Under the circumstances, the taking of a 6 years' purchase was not proper in my opinion. A careful examination of the cases fails to disclose one in which the years of purchase were more than the total life of the corporation. Thus, in Matter of Ball, 161 App. Div. 79, 146 N. Y. Supp. 499, the average annual profits were multiplied by 2, the corporation being 7 years old; in Matter of Silkman, supra, the same were multiplied by 2, the corporation having been in existence 19 years; in Von Au v. Magenheimer, supra, the same were multiplied by 6, the life of the corporation being over 10 years; in Matter of Keahon, 60 Misc. Rep. 508, 113 N. Y. Supp. 926, they were multiplied by 3, the corporate existence being 15 years; in Matter of Weatherbee, 157 N. Y. Supp. 652, they were multiplied by 5, the life of the corporation being 30 years; and in Matter of Gumbinner, 92 Misc. Rep. 104, 155 N. Y. Supp. 188, the purchase was 2 years, and the life of the corporation 18 years.

It will be seen from these matters that there is no fixed rule for taking any specific number of years' purchase of the average profits. In Von Au v. Magenheimer, supra, the Appellate Division said that the number of years' purchase that were to be taken was a question of fact.

If the appraiser was right in disregarding the sales and the testimony of the treasurer, and in basing his valuation entirely on the so-called book value of the stock plus the value of the good will, then I think that under all the circumstances a more just result would have been reached if he had taken the actual net profits made during the life of the corporation, about 20 months, as being the value of the good will, instead of a 6 years' purchase of the average annual profits. If this be done, and the figure thus obtained be substituted for that

obtained by the appraiser as the value of the good will, the total net value of the shares would be only slightly in excess of the amount at which I have arrived.

I accordingly hold that the said shares should have been appraised at $44 per share. The appeal is sustained, the order reversed, and the report remitted to the appraiser for correction as indicated.

Appeal sustained, and order reversed.