In the Matter of the Judicial Settlement of the Account of Proceedings of Grace Quartley Brown and Others, as Executors, etc., of Stephen Howland Brown, Deceased, Appellants.

Charles Brandt, Jr., as Special Guardian for Certain Infants, Respondent.

First Department, February 6, 1925.

Executors and administrators — testator was member of established firm of stockbrokers — said firm was known as "odd lot house" and specialist and was favorably known for honesty and experience — business had good will and testator's share is part of assets of estate — good will figured on basis of twice average annual net profits for three years preceding death of testator, not attributable to investments of firm funds, personal services, and profits of speculative transactions — said annual net profits determined by deduction from annual profits, interest on investments, and value of personal services of firm members not apportioned to speculative business — executors' account surcharged with amount of testator's share of good will.

Under modern views a stock brokerage firm has a good will which is valuable according to the circumstances surrounding the firm, and, therefore, the account of executors of a member of the firm will be surcharged with the value of the testator's share of the good will of the firm, where they have not charged

themselves with it, and where it appears that the firm was known as an " odd lot house " and specialist; that they did an extensive business on the New York Stock Exchange and were widely and favorably known for their honesty, integrity and experience; that the testator was connected with the firm from 1901 to the date of his death in 1917, and that the offices were located at the same place during all the time the testator was connected with the firm.

The referee properly computed the value of the good will of the firm on the basis of twice the average annual net profits for the three years immediately preceding the death of the testator not attributable to investments of firm funds, personal services rendered by members of the firm, and profits on speculative transactions.

In determining the net profits for the three years immediately preceding the testator's death, the referee properly deducted from the profits as thus determined, the interest at six per cent on the capital invested in other than speculative business, and the value of the services of the members of the firm not apportioned to the speculative business of the firm.

The account of the executors is surcharged with the testator's share of the good will as thus determined. ·

APPEAL by Grace Quartley Brown and others, as executors, from certain parts of a decree of the Surrogate's Court of the county of New York, entered in the office of the clerk of said Surrogate's Court on the 24th day of October, 1924, in proceedings for the judicial settlement of the account of the executors.

The opinions of the referee and surrogate are reported in *Matter of Brown* (124 Misc. 473).

*Lord, Day & Lord* [*Franklin B. Lord* of counsel; *Sherman Baldwin* with him on the brief], for the appellants.

*Charles Brandt, Jr.,* special guardian, respondent.

BURR, J.:

The executors, appellants, filed their verified petition praying for a judicial settlement of their account of proceedings as such executors and trustees herein, together with their account of said proceedings up to and including September 14, 1921.

Respondent, as special guardian for certain infants, filed objections to said account, the main and most important of which was the failure and omission on the part of the executors, appellants, to include in their account, among the items of " capital received " by said accounting executors and trustees at the time of testator's death, the sum of $38,682.12, representing the value of the interest of decedent in the good will of the firm of Vernon C. Brown & Co., of which said firm the decedent, at the time of his death, was a member.

By an order dated February 6, 1923, the surrogate appointed a referee to inquire into the jurisdictional facts, to examine said account and objections, to hear and determine all questions arising upon the settlement of said account which the surrogate has power

to determine, and to make and report to the court with all convenient speed.

The referee filed his report finding in substance that the character and scope of the business of Vernon C. Brown & Co., of which the deceased was a partner, included elements of good will, and surcharging the executors jointly and severally with the sum of $15,583.74, the amount of the value of the interest of decedent in and to said good will as fixed by said referee.

The Surrogate's Court affirmed the said referee's report, and overruled the objections filed thereto by said executors; and it is this appeal from such decree that brings up for review by this court the question of good will involved in this proceeding.

Stephen H. Brown, the testator, died July 20, 1917, and at the time of his death was a member of the firm of Vernon C. Brown & Co. The firm, originally known as Watson & Brown, was organized in 1895 for the purpose of doing a stock brokerage business. Said firm continued down to the year 1901, when Mr. Watson, the senior member of the firm, withdrew, and the firm, composed of Vernon C. Brown and the decedent Stephen H. Brown, continued under the name of Vernon C. Brown & Co.

Subsequently Hildreth K. Bloodgood, Temple T. Berdan, George W. Brown, Frank Schoonmaker and Francis A. Wellman were variously admitted to the firm in the order in which they are here mentioned. No written articles of copartnership were ever entered into between the members of said firm, except that on January 2, 1911, written articles of copartnership were drawn up between Vernon C. Brown, Stephen H. Brown, Hildreth K. Bloodgood, Temple T. Berdan and Frank L. Schoonmaker for a period of one year. Vernon C. Brown contributed as capital $150,000, Mr. Bloodgood $150,000, Stephen H. Brown $75,000 and his Stock Exchange seat, and the other members of the firm contributed their Stock Exchange seats.

At the time of the death of Stephen H. Brown, Mr. Schoonmaker had withdrawn from the firm. The original firm of Watson & Brown and the subsequent new firm of Vernon C. Brown & Co. maintained and conducted their business at No. 80 Broadway, borough of Manhattan, city of New York, and continued doing so at that place up to about July 26, 1920, when they removed their offices from 80 Broadway to 74 Broadway, on the same side of the street, but a few doors from their original location, and they sent removal notices to members of the Stock Exchange.

Ever since the inception of said firm, and dating back to the organizing of Watson & Brown in 1895, they did a general stockbrokers' business, and were what was known as an " odd lot house "

and specialists. Up to about the year 1913, when the decedent was seized with the illness that terminated fatally, he was the board member of the firm on the floor of the New York Stock Exchange.

In addition to the decedent the firm of Vernon C. Brown & Co. was represented on the floor of the New York Stock Exchange by two other members of the firm, who were doing business as specialists and dealing in odd lots. The reason for this was that brokers who were looking for odd lots would go to the floor of the Exchange and deal with the board member. It was the board member who dealt in odd lots.

The firm also did what was known as a two-dollar business — or, more accurately speaking, a two-dollar-and-fifty-cent business — that being the rate which they charged as brokerage when engaged in buying or selling stocks for other firms. Such occasions would arise when the board member of some other brokerage house was too busy to watch certain orders himself, and then he would send to a floor member of the firm of Vernon C. Brown & Co. the order for the purpose of executing the same; and when such order was executed there was a charge of two dollars and fifty cents for the same; and this two-dollar business was the result of a board member becoming a specialist in certain stock, and also remaining at what is known as his " post." Most of the profits of the firm's business came from the two-dollar and odd lot business, which depended largely on the honesty of the members of the firm, as well as their integrity and experience.

In 1913 the decedent was supplanted by Mr. Wellman as the board member of the firm. At that time, when the decedent became ill and was incapacitated by his ailment and thereby prevented from continuing his activities as the board member of the firm, an arrangement was made between the firm of Vernon C. Brown & Co. and decedent, whereby he left his $75,000 in the firm and in return they gave him an interest of fifteen per cent in the profits of the business. Prior to that time the decedent Stephen H. Brown was receiving a thirty-three per cent interest in the profits. This arrangement was not committed to writing.

In the transfer tax proceeding in this estate the appraiser, over objection by the executors, found the value of decedent's interest in the good will of the firm of Vernon C. Brown & Co. to be $38,682.12. The executors in their account stated that they had not collected the good will because testator was not entitled to anything as his interest in it. In the original schedules filed by the executors in the transfer tax proceeding only the cash interest of the decedent in the firm was set forth. No interest in good will

was included. The appraiser found there was good will and fixed its value at $110,232.34. A protest being filed against this amount or any amount for good will, and in any event it appearing there was an error in the appraiser's computation, the amount was reduced to $38,682.12, the amount with which the special guardian sought to surcharge the executors.

The referee computed the value of the good will on a different basis. He found that the decedent's interest therein was $15,583.74, and that the executors should be surcharged with that amount. The referee, after describing the different branches of the brokerage business carried on by the firm, found that all contained elements of good will excepting only the trading by the firm members on account of the firm itself, i. e., the speculative branch of the business.

The learned surrogate in confirming the report of the referee said: " The evidence adduced concerning the character and scope of the business of Vernon C. Brown & Co. shows that the business included elements of good will. Under the facts proven the rule adopted by the referee in determining the value of the good will was properly applied and the computation was just and equitable. (*Matter of Halle*, 103 Misc. 661.)"

In *Matter of Halle* (*supra*) the question involved was: Did the firm of Halle & Stieglitz, of which the decedent was a member, have a good will? The firm of Halle & Stieglitz, like the firm of Vernon C. Brown & Co., was engaged in the city of New York as stockbrokers, and on page 663 of *Matter of Halle* (*supra*) Surrogate FOWLER says: " It is contended by the executors that the business did not have a good will. This question can only be determined upon evidenc showing the length of time the firm has been engaged in that business, the extent to which it was known to the trade or the public, its location in regard to conspicuousness and permanency, and its reputation for business dealings."

The firm of Vernon C. Brown & Co., which succeeded the firm of Watson & Brown, organized in 1895, had been in existence since 1901. Up to the summer of 1919 it had maintained its place of business at No. 80 Broadway, New York city, and then when it moved it moved only a few doors away on the same side of the street. Its location was well known to its trade and to the public. The decedent was a member of a number of prominent clubs and social organizations, and was well known socially. He was well known for his honesty, integrity and efficiency as a broker, as a result of which he created a reputation that redounded to the benefit of the firm. True, the reputation of the firm was due not only to his own efficiency, but also to the efforts of the other members of the firm.

The firm had built up a reputation as odd lot dealers and specialists, and were, therefore, well known to the trade, and the brokers upon the floor of the Stock Exchange had confidence in the ability and integrity of the members constituting the firm of Vernon C. Brown & Co. Such of the public as did purchase stocks or securities for investment from the firm were impelled to do so by virtue of the reputation which the firm of Vernon C. Brown & Co. had built up. In fact several Wall street banks were customers of the firm. The reputation of the firm for honesty, integrity and efficiency was the means of developing and creating a favorable attitude of the trade and of the public towards decedent's firm.

The record before the referee showing the balance sheet of the firm as of July 20, 1917, discloses the fact that there was owing to the firm of Vernon C. Brown & Co. by their customers on July 20, 1917, the date of decedent's death, the sum of $3,369,794.31; and that they borrowed and owned stocks aggregating nearly $450,000. The same balance sheet further shows that the firm owed to customers $298,428.80, and to banks and trust companies $2,850,000.

Executors' Exhibit 8 before the referee, being profit and loss statement of the firm for the years 1914, 1915 and 1916, shows that the following commissions were earned by the firm of Vernon C. Brown & Co.: In 1914, $12,883.61; in 1915, $63,992.08; and in 1916, $63,415.66. By commissions is meant moneys which the firm earned from margin accounts and from others.

From the same exhibit it appears that the following brokerage was earned by the firm of Vernon C. Brown & Co.: In 1914, $6,695.93; in 1915, $23,623.87; and in 1916, $47,100.59. By brokerage is meant the two-dollar business, or the amount that they charged brokers in purchasing or selling for them odd lots on the floor of the Exchange.

The interest items as shown by the said exhibit were as follows: In 1914, $40,519.57; in 1915, $44,304.39; and in 1916, $48,564.26. By interest is meant what the firm charged for carrying customers' accounts on margin; also the profit made in handling money and making loans on the Stock Exchange.

The volume of business done during those three years in odd lot transactions, as well as the transactions in stock incidental to business, by which is meant the business derived from selling to customers securities which the firm bought for investment, all indubitably point to the fact that all of this volume of business was attributable to the favorable attitude of the trade and of customers due to the reputation of the firm of Vernon C. Brown & Co.

The evidence discloses the fact that in addition to the long-established location of the business in one place, its location in regard to conspicuousness and permanency, there was the added element of its high reputation for honesty, integrity, experience and ability in its business dealings.

The executors, in negation of the contention made by the special guardian that there is a good will, submitted what purports to be proof of a general understanding that the partners, either when they entered the firm or withdrew therefrom, never paid or received anything for the good will. On the other hand, there is a complete absence of proof that at any time was there any written agreement whereby the members of the firm of Vernon C. Brown & Co. concluded or agreed that in the event of the death or withdrawal of. a member of the firm, his interest in the good will should revert to the surviving or continuing members and become their sole, exclusive and absolute property, without any compensation or consideration to be paid therefor.

The only written articles of copartnership were those that were concluded in January, 1911, and offered in evidence, and such articles of copartnership omit any reference or allusion to the good will of the firm of Vernon C. Brown & Co., or of its disposition in the event of the death or withdrawal of any member of such firm. No attempt was ever made by any form of agreement to fix a value as to the good will, or conclude that there was to be no value respecting such good will.

The referee in his report stated the method by which he arrived at the amount of the good will, as follows: " I hold that the firm of Vernon C. Brown & Company had a good will at the time of the death of the decedent and that his estate is entitled to 15% of the value thereof, that being the extent of his interest in the partnership. The transfer tax appraiser has fixed the value of the decedent's interest in the good will at $38,682.12 and the decree fixing the transfer tax was entered upon the appraiser's report. However said determination is not controlling in this proceeding (*Matter of Crawford,* 85 Misc. 283; *Amherst College* v. *Ritch,* 151 N. Y. 282), nor is the fact that the executors have since paid said tax. The appraiser fixed the value of the good will at three times the average annual net earnings not attributable to the investment of the firm funds nor to the personal services of the members. I shall adopt the same general method, but shall deduct from the total profits the amount of profits which arose out of speculative transactions (to which I have held, above, the element of good will does not attach), and shall apportion to the various departments of the business, the expenses, interest and salaries.

Furthermore, the business in this case being quasi-professional and personal, I find that the three years' purchase of the net annual profits (calculated on an average of three years) usually employed in measuring the value of the good will of commercial concerns should not be applied here. The nature and character of the business of Vernon C. Brown & Company is such that two years' purchase is just and equitable.

" Applying these principles to the data before me, we have the following computations. The aggregate gross profits of the speculative account for the years 1914, 1915 and 1916 immediately preceding decedent's death, are $372,552.85, which is 39.57% of $941,442.32, the aggregate profits of the entire business for those years. Accordingly the average annual net profits for said period, exclusive of the speculative account were $160,719.80. From this should be deducted the annual interest at 6% on 60.43% (the portion not applicable to the speculative business) of the $350,000. capital invested, or $12,690.30. In thus fixing the invested capital I have not included the value of the Exchange seats held by some of the members of the firm for the reason that the witness for the executors (whose figures as to the value of members' services I have adopted) testified that he had taken into consideration the value of the use of the seats in fixing the value of the services of the members of the firm. In fact the cash capital investment was also included by the witness, but under all the circumstances for the purpose of this computation, I have allowed interest thereon at 6% per annum. The 30 to 40% testified to by the executors' witness as the return upon investment received by Stock Exchange firms is high, and as it was expressly stated to include also the partners' personal services, that percentage cannot be allowed here because I am allowing deduction for the services of the firm members. Executors' witness fixed the value for the members' services at an average of $159,000 per annum. While this appears liberal it was not shown to be unreasonably high. However the estimated salaries covered the activities of the members engaged in all the branches of the business, including the speculative, and accordingly the total should be reduced by a proportionate amount which can be said to be the portion of the salaries attributable to the speculative branch of the business. I shall apportion the salaries to the speculative branch in proportion to the profits realized therein and accordingly find that the deductible item for salaries is $96,083.70. Deducting said sums of $12,690.30 and $96,083.70 from the sum of $160,719.80, above, we have $51,945.80. Taking two years' purchase as the value of the good will we have $103,891.60. Decedent's interest in the firm's good will is 15% of this, or $15,583.74."

The findings of the referee are fully sustained by the evidence. The good will of a trade or business is undoubtedly a valuable right of property, and in view of the tremendous advance in the brokerage business as a phase of commercial life, it can no longer be said that a brokerage house, such as the one under consideration, long established, well known, of high reputation, transcending the individual responsibility of the members who constitute it, so involves and depends upon the personal qualifications and professional activities of the individuals who carry on the business as necessarily to prevent good will from attaching thereto.

In *Macfadden* v. *Jenkins* (40 N. Dak. 422) the Supreme Court of North Dakota said: " Good will by reason of the great progress of society is considered to be a property right in a great many instances, and under a great many conditions to which it was formerly held not to apply. Under the more modern view, courts are extending the meaning of good will so that even professions may be included." In that case the business was real estate and loans, and the court held that it had a valuable good will.

In *Wilson* v. *Williams* (29 L. R. Ir. 176) the court limited the decision to the facts immediately before it, expressly disclaiming any intention to " lay down any hard and fast rule as to stockbrokers' business being, in every case, incapable of good will." The case is distinguished in *Hill* v. *Fearis* (L. R. [1905]1 Ch. 466), a case much in point, which holds that good will was an asset of a stock brokerage firm and that the surviving member thereof must account for the decedent's interest in said good will.

The court (at p. 472) said: " It is said that there is no such thing as good will in a stock broker's business, first, because of the nature of the connection between the stock broker and those with whom he does business. That I do not quite follow. * * * I can quite imagine that the successor in business of the old broker might * * * get an advantage in that way by being able to represent that he was carrying on the original business. It seems to me, therefore, that that branch of the argument fails — that it is impossible to say that the advantage derived from the connection may not be of some pecuniary value. * * * He may be able to represent to clients that he is the successor in the business, and get such advantage as there may be arising out of the connection without saying that he is entitled to carry on the business in the old name." At page 477: " I hold that in winding up the affairs of this partnership the good will must be treated as one of the assets of the firm, and must be realized with the other assets of the firm."

Lord ELDON long ago, in the case of *Cruttwell* v. *Lye* (17 Ves. 335, 346), said: " The good will, which has been the subject of sale,

is nothing more than the probability, that the old customers will resort to the old place."

This definition was strictly applied in subsequent cases to the retail business and general commercial enterprises in which the characteristic unit of trade was the shop. Later cases, in this State particularly, have extended Lord ELDON's definition so as to embrace two distinct advantages of the business to successors, namely, the advantage of continuing an established business in its old place and of continuing it under its old style or name. (*People ex rel. Johnson Co.* v. *Roberts*, 159 N. Y. 70; Story Part. § 99; *Matter of Silkman*, 121 App. Div. 202.)

In the case of *People ex rel. Johnson Co.* v. *Roberts* (*supra*, 82) Judge VANN, writing the opinion for the court, says: " Mr. Lindley, in his treatise on Partnership (Vol. 2, page 439), says: ' The term good will can hardly be said to have any precise significance. It is generally used to denote the benefit arising from connection and reputation, and its value is what can be got for the chance of being able to keep that connection and improve it. Upon the sale of an established business its good will has a marketable value, whether the business is that of a professional man, or that of any other person. But it is plain that good will has no meaning except in connection with a continuing business; it may have no value except in connection with a particular house, and may be so inseparably connected with it as to pass with it under a will or deed without being specially mentioned.' * * *

" Good will embraces at least two elements, the advantage of continuing an established business in its old place, and of continuing it under the old style or name. While it is not necessarily altogether local, it is usually to a great extent, and must, of necessity, be an incident to a place, an established business or a name known to the trade."

In *Matter of Silkman* (*supra*, 216) JENKS, J., writing the opinion of the court, says: " In *Churton* v. *Douglas* (H. R. V. Johns. 174), Vice Chancellor Wood said: ' The name of a firm is a very important part of the good will of the business carried on by the firm. A person says, I have always bought good articles at such a house of business; I know it by that name, and I send to the house of business identified by that name for that purpose. * * * That the name is an important part of the good will of a business is obvious when we consider there are at this moment large banking firms and brewing firms and others in this metropolis which do not contain a single member of the individual name exposed in the firm.' Lord ELDON's famous definition, ' the probability that the old customers will resort to the old place,' is not so literal as

to mean that the customers must actually come to the old place, but simply that old customers will continue.    *    *    *

" Good will, of course, does not keep the customers from buying in the lowest market.    Barter is not conducted on philanthropic principles; but good will promises the business that it may see the return of old customers whom it has treated fairly in price and in quality.    In the case at bar, as I have already shown, Mr. Shaw did not wind up the business and did not begin a new business. The business was continued in every detail and in every respect without even the change of a business card, a billhead or the letter paper.    In Williams on Executors (Vol. 3 [R. & T. ed.], p. 131) it is said: ' The good will of the decedent's business is to be accounted for as part of the assets of his estate (*Matter of Randell*, 2 Connolly, 29; *Thompson* v. *Winnebago County*, 48 Ia. 155); and to be considered in valuing his interest in a continuing partnership business.    *    *    *' "

In the case of *Niles* v. *Fenn* (12 Misc. 470, 471) McADAM, J., says: " Although the business sold was a professional one, the law recognizes the fact that it has a good will, which may be sold as an incident of the business.    If the customers decline to go to the ' old stand,' this is the plaintiff's misfortune; but the defendant must not interfere to the plaintiff's prejudice.

" Good will is a commodity (1 Coll. Part. [6th ed.] 226 *et seq.*); means the custom of any trade or business (Web. Dic.); resolves itself into reputation (*Howe* v. *Searing*, 6 Bosw. 354); is the probability that the old patrons will continue customers at the old place [*Cruttwell* v. *Lye*, 17 Ves. 346; *Fenn* v. *Bolles*, 7 Abb. Pr. 202], and includes every possible advantage that has been acquired by the vendor while carrying on the business.    [*Glen & Hall Mfg. Co.* v. *Hall*, 61 N. Y. 226.]    It is a species of property depending on circumstances for its value."

The executors, in support of their contention that there is no such thing as good will in the firm of Vernon C. Brown & Co., cite the case of *Read* v. *Mackay* (47 Misc. 435).    A careful reading of that case discloses the fact that while the court dealt there with the question of the firm name of a banking concern, it did not hold that such a firm has no good will, but on the contrary, recognizes its existence.

The method adopted by the referee for appraising the value of the good will of the decedent in the firm of Vernon C. Brown & Co., and the value of his interest therein, was correct.

In *Matter of Bolton* (121 Misc. 51, 52) Surrogate SCHULZ, writing the opinion of the court, says: " In ascertaining the value of the good will, the approved method is to obtain the average

yearly net profit extending over a period of years after deducting interest at six per cent on the amount of capital invested each year (*Matter of Seaich,* 170 App. Div. 686; affd., 219 N. Y. 634; *Matter of Ball,* 161 App. Div. 79; *Matter of Silkman,* 121 id. 202; affd., 190 N. Y. 560; *Von Au* v. *Magenheimer,* 115 App. Div. 84; 126 id. 257; affd., 196 N. Y. 510), and then to take a number of years' purchase of the balance. There is no hard and fast rule as to the number of years of which an average shall be obtained nor as to the number of years' purchase that shall be taken. See cases cited in *Matter of McMullen,* 92 Misc. Rep. 637. In each instance the particular circumstances must be considered."

The Surrogate's Court properly surcharged the account of the executors jointly and severally with the said sum of $15,583.74, the value of decedent's interest in and to the aforesaid good will.

In *Matter of Silkman* (121 App. Div. 202) the executors in their accounting failed to include the value of the decedent's interest in and to the good will of a certain firm of which he was a member at the time of his decease, and the surrogate ordered their account to be charged accordingly, and such surcharge was upheld.

The order of the surrogate confirming the referee's report should be in all respects affirmed, with the costs of this appeal.

CLARKE, P. J., DOWLING, MERRELL and McAVOY, JJ., concur.

Decree affirmed, with costs.